IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 6, 2017 Session

## CARLISA ELMI v. CHEATHAM COUNTY BOARD OF EDUCATION, ET AL.

**Appeal from the Chancery Court for Cheatham County**
**No. 16561    David D. Wolfe, Chancellor**

———————————————

### No. M2016-02024-COA-R3-CV

———————————————

This is an appeal of the termination of a tenured teacher's employment pursuant to the Tenure Act, Tenn. Code Ann. §§ 49-5-501 and -515. The Cheatham County Director of Schools initiated these proceedings by filing a notice of charges recommending the termination of the tenured teacher on the grounds of insubordination and inefficiency. Following an administrative hearing, the hearing officer recommended dismissal. When the Cheatham County Board of Education voted to sustain the hearing officer's decision and to dismiss the tenured teacher, the teacher sought review of the decision in the chancery court. The chancery court affirmed her dismissal, and this appeal followed. We have determined that the evidence preponderates against the chancery court's factual findings and its conclusion that the teacher was insubordinate and inefficient as those terms are defined in the Tenure Act. We have also determined that the record fails to establish any basis for the dismissal of a tenured teacher. Therefore, we reverse the judgment of the chancery court and remand with instructions for the chancery court to determine the relief to which the tenured teacher is entitled for being dismissed without justification. This includes whether the teacher is entitled to back pay pursuant to Tenn. Code Ann. § 49-5-511(a)(3) and, if so, in what amount.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Richard L. Colbert and Kelley E. Strange, Nashville, Tennessee, for the appellant, Carlisa Elmi.

Allen Woods, Nashville, Tennessee, for the appellee, Cheatham County Board of Education, David Bibee, Brian Chase, James Gupton, John Louallen, Kimberly Messer, and Dan Moore.

**OPINION**

Carlisa Elmi is a tenured teacher with almost thirty years of teaching experience. She received a bachelor of science degree in elementary education from Austin Peay University in 1987 and a master's degree in administration and supervision from Trevecca Nazarene University in 1991. She taught at Ashland City Elementary School ("ACES") in Cheatham County for nineteen years, from 1994 to May 2015. She taught third grade during the 2012-2013 school year and second grade during the 2013-2014 school year.

In May 2015 the Cheatham County Director of Schools, Stan Curtis, notified Ms. Elmi that he was seeking her dismissal. He sent his recommendation of charges on the grounds of insubordination and inefficiency to the Cheatham County Board of Education ("the Board") pursuant to Tenn. Code Ann. § 49-5-511.[1] In his recommendation, he identified four grounds of insubordination: (1) arriving to school late on thirteen occasions during the 2012-2013 school year; (2) failing to enter grades promptly during the 2012-2013 school year; (3) failing to follow the principal's instructions regarding a disobedient student on April 29, 2014; and (4) failing to fulfill a plan of assistance implemented to improve Ms. Elmi's teacher evaluation scores. He also recommended that Ms. Elmi be dismissed for inefficiency based on below-average evaluation scores for school years 2012-2013 and 2013-2014.[2]

In July 2014, Ms. Elmi was notified that the Board had voted that the charges against her were of such a nature as to warrant dismissal. As a consequence of the Board's initial decision, Ms. Elmi requested a hearing pursuant to Tenn. Code Ann. § 49-5-512(a).

On October 23, 2014, an administrative hearing officer conducted a hearing on the charges. Larry Roney, the principal of ACES, and Ms. Elmi were the only witnesses to testify. Following the hearing, the administrative hearing officer upheld the Board's

---

[1] In the Board's brief on appeal and in the opening statement of Director Curtis' letter to Ms. Elmi, it is stated that the Board "is not recommending you for rehire." This is inaccurate in two respects. Tenure is a status under which a teacher has a legitimate expectation of continued employment until she resigns, retires, or *is dismissed pursuant to the Tenure Act. Thompson v. Memphis City Schs. Bd. of Educ.*, 395 S.W.3d 616, 623 (Tenn. 2012). The continued employment of a tenured teacher does not require "rehire" or a recommendation by the Board. Moreover, the Board did not recommend that Ms. Elmi not be "rehired." Director Curtis made the recommendation to the Board that Ms. Elmi be dismissed pursuant to the Tenure Act.

[2] It is relevant to note that the Board is not the charging party. In this case, the Cheatham County Director of Schools, Stan Curtis, is the charging party under Tenn. Code Ann. § 49-5-511, and the Board is the deciding body under Tenn. Code Ann. § 49-5-512(b). Nevertheless, it is the decision of the Board to terminate Ms. Elmi's employment which is at issue.

decision to dismiss Ms. Elmi for both insubordination and inefficiency, finding many of the material facts to be uncontroverted. The hearing officer made several findings including the following: (1) Ms. Elmi admitted to being tardy as alleged but "explain[ed] her failure to report to work on time was a result of her having to take her child to school in Nashville;" (2) Ms. Elmi admitted her alleged failure to enter grades in accordance with ACES policy during the 2012-2013 school year; and (3) Ms. Elmi admitted that her evaluation scores decreased from a 2.68 for the 2012-2013 school year to a 2.55 for the following school year. The hearing officer also determined that Ms. Elmi failed to follow Principal Roney's instructions regarding a disobedient student in April 2014. Based on these and other findings, the hearing officer ruled that Ms. Elmi could be dismissed on the grounds of insubordination and inefficiency.

Ms. Elmi timely commenced this action by filing a Complaint and Petition for Writ of Certiorari against the Board in accordance with Tenn. Code Ann. § 49-5-513. As a consequence, the Board filed with the chancery court the entire record from the administrative hearing as required by Tenn. Code Ann. § 49-5-512(4) ("It shall be the duty of the board to cause the entire record and other evidence in the case to be transmitted to the court."). For reasons not explained by the record, the Board also filed approximately two-hundred pages of documents that had not been filed in the administrative hearing or considered by the hearing officer.

Ms. Elmi subsequently filed her First Amended Complaint and Petition for Writ of Certiorari to add the members of the Board, David Bibee, Kimberly Messer, Dan Moore, James Gupton, John Louallen, and Brian Chase (hereinafter collectively "the Board") as respondents. The Board timely filed answers to both complaints. Ms. Elmi principally argued that the evidence preponderated against the administrative hearing officer's findings.

The chancery court affirmed the administrative hearing officer's decision in all respects but one.[3] The court upheld the decision to dismiss Ms. Elmi on the ground of insubordination upon the findings that (1) Ms. Elmi was late arriving to work on thirteen separate occasions; (2) Ms. Elmi failed to post grades in accordance with school policy during the 2012-2013 and 2013-2014 school years; and (3) Ms. Elmi failed to follow Principal Roney's instructions regarding a disobedient student in April 2014. The court also held that the Board substantiated the inefficiency charge by showing that Ms. Elmi's evaluation scores declined from the 2012-2013 school year to the 2013-2014 school year. This appeal followed.

---

[3] The court found that the Board did not present sufficient proof that Ms. Elmi failed to fulfill the plan of assistance, which was the fourth ground for insubordination. Since neither party takes issue with this finding on appeal, we will not address it.

ISSUES

Ms. Elmi asks us to consider the following issues:

1. Did the chancery court correctly find that she was guilty of insubordination under the Tenure Act based on alleged late arrivals to school, alleged failure to promptly enter grades, and alleged failure to follow administrative instructions regarding an allegedly out-of-control student?

2. Did the chancery court correctly find that she was guilty of insufficiency under the Tenure Act based on the evaluation results?

3. Does the Board's filing of documents with the chancery court that were outside the record of the administrative hearing require a remand of the case?

4. Did the chancery court follow the appropriate de novo standard of review when it decided that the Board was justified in terminating Ms. Elmi's employment?

## STANDARD OF REVIEW

Under the Tenure Act, when a school board terminates a tenured teacher's employment, the teacher has the right to a chancery court review of the school board's decision. Tenn. Code Ann. § 49-5-512(c)(4). No presumption of correctness attaches to the school board's decision, and the defendants carry the burden of proof upon a de novo review to demonstrate that the action of the school board is justified by the evidence. *Saunders v. Anderson*, 746 S.W.2d 185, 190 (Tenn. 1987) (op. on petition to rehear). The chancery court's review is limited to the written record of the hearing before the board and to any evidence or exhibits submitted at the hearing. Tenn. Code Ann. § 49-5-513(g).

On appeal, our review is de novo on the record with a presumption that the chancery court's factual findings are correct, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 142 (Tenn. 2017). We subject the chancery court's conclusions of law to a de novo review with no presumption of correctness. *Emory*, 514 S.W.3d at 142.

## ANALYSIS

We have chosen to address the third issue raised by Ms. Elmi out of turn because it challenges the propriety of the record filed in the chancery court.

## I. THE RECORD FROM THE ADMINISTRATIVE HEARING

Ms. Elmi contends the case must be remanded to the trial court for a de novo review, because the Board filed approximately two-hundred pages of documents with the chancery court that were not part of the record of the administrative hearing, and it cannot be determined whether the chancery court erroneously relied on the extraneous documents in reaching its decision.[4]

A writ of certiorari is simply an order directing an inferior tribunal to send up a complete record for review. *State v. Lane*, 254 S.W.3d 349, 354 (Tenn. 2008). At all times material to this action, the Tenure Act has called for a de novo review by the chancery court of "the record" from the dismissal hearing. *See* Tenn. Code Ann. § 49-5-512(c)(4). Thus, but for limited exceptions, the court's review of the administrative hearing is limited to the record from that hearing and the appeal of that hearing as heard by the board of education. *See Id.* One exception can be found at Tenn. Code Ann. § 49-5-513(g), which permits the introduction of additional evidence to establish arbitrary or capricious action or violation of statutory or constitutional rights; however, there is no indication that the Board filed these documents with the court for that purpose. Moreover, we find no other exceptions that justify the filing of these extraneous documents. Therefore, these documents cannot be considered when conducting a de novo review of the decision of the administrative hearing officer.

The Board acknowledged at oral argument that it filed approximately two-hundred pages of documents with the chancery court that were not admitted at the administrative hearing. The Board should not have filed these documents with the trial court, and more importantly, they cannot be considered by the trial court or by this court when ruling on the merits of Ms. Elmi's claims. Having reviewed the chancery court's memorandum order and specifically its findings of fact, we find no indication that the court considered these extraneous documents. Therefore, the filing of these documents, although improper, has not prejudiced Ms. Elmi.

## II. DE NOVO REVIEW

Ms. Elmi also contends the chancery court failed to conduct a de novo review of the Board's decision to terminate her employment.

---

[4] Ms. Elmi acknowledges that some of these documents are copies of documents from the administrative hearing; however, a number of them were not part of the administrative hearing. Thus, these documents should not have been filed with the chancery court and may not be considered by the court.

Tenn. Code Ann. § 49-5-512(c)(4) directs the chancery court to make a de novo determination of all matters at issue. This form of judicial review requires the court to make a fresh and independent determination of both the facts and the law. *Cooper v. Williamson Cty. Bd. of Educ.*, 746 S.W.2d 176, 181 (Tenn. 1987). It is not sufficient for the court to simply determine whether the evidence preponderates in favor of the Board's decision to terminate a tenured teacher. *Id.* As *Cooper* explained:

> [T]he scope of review in the Chancery Court is not confined to a determination of whether the evidence preponderates in favor of the determination of the administrative board and no presumption of correctness attaches to the decision of the school board. . . . We think that a hearing *de novo* requires the Chancellor to redetermine both the facts and the law from all the evidence before the court. While not fully analogous, this type of review is more akin to an appeal from General Sessions Court pursuant to T.C.A. § 19–1–118 than to the review of the findings of a trial court in a nonjury case by an appellate court under Rule 13, T.R.A.P. Under Rule 13, T.R.A.P., an appellate court does
>
>> "not *try* a case de novo as does a Circuit Judge on an appeal from the General Sessions Court. In a *de novo trial* the Circuit Judge does not review the action of the General Sessions Judge and is not concerned with what took place in the General Sessions Court nor the propriety of the lower Court's action; and no presumption of correctness attaches to the General Sessions judgment. The matter is *tried* as if no other trial had occurred."
>
> *Hohenberg Bros. Co. v. Missouri Pacific Railroad Co.*, 586 S.W.2d 117, 119 (Tenn. App. 1979) (emphasis in original). Unlike the situation in an appeal to a court of record from General Sessions Court, which does not ordinarily preserve a record of its proceedings, a record of the hearing before the school board may be preserved and transmitted to the Chancery Court and this record can become a part of the evidence before the Chancellor. . . .
>
> We think that review under T.C.A. 49–5–513 [sic] manifestly requires the Chancellor to reconsider and redetermine all issues of fact as well as law as if no such determination had been previously made. T.C.A. § 49–5–513(h) requires the Chancellor to "reduce his findings of fact and conclusions of law to writing and make them parts of the record." A ruling that the evidence preponderates for or against the determination of the school board does not comply with this provision of the statute. In contrast, the review before this Court on direct appeal under T.C.A. § 49–5–513(i) is limited to

the record made in the Chancery Court, making the distinction between a hearing de novo in that Court and the scope of de novo appellate review clear for the purposes of this statutory scheme. As we stated in *Davis v. Barr*, supra, any determination of whether or not a teacher should be dismissed, suspended, or reinstated "can only be made after a full evidentiary hearing on the merits, for we have in the pleadings before us disputed factual issues." 646 S.W.2d at 918. Under this statute, the Chancellor completely substitutes his judgment for that of the school board.

*Cooper*, 746 S.W.2d at 181-82.

With the foregoing principles in mind, we shall review the chancery court's findings of fact and conclusions of law as they pertain to each ground. We will also consider the ultimate determination that the Board was justified in terminating Ms. Elmi's employment. In doing so, we will ascertain whether the chancery court complied with the de novo standard of review applicable to this case.

### III.    INSUBORDINATION

The chancery court held that the Board had proven the following three grounds of insubordination: (1) arriving to work late on thirteen occasions during the 2012-2013 school year; (2) failing to post grades during the 2012-2013 and the 2013-2014 school years; and (3) refusing to follow the principal's instructions regarding a disobedient student.

The Tenure Act provides that a tenured teacher may be dismissed or suspended on the basis of insubordination. Tenn. Code Ann. § 49-5-511(a)(2). The General Assembly has defined "insubordination" under the Tenure Act as follows:

Refusal or continued failure to obey the school laws of this state, to comply with the rules and regulations of the board or to carry out specific assignments made by the board, the director of schools, or the principal, each acting within its own jurisdiction, when the rules, regulations and assignments are reasonable and not discriminatory.

Tenn. Code Ann. § 49-5-501(7)(A). Thus, a teacher is insubordinate when he or she *refuses* or *continually fails* to obey or to comply with the rules or to carry out specific assignments made by the principal, provided the rules and assignments are reasonable and not discriminatory. *Id*.

- 7 -

## A. LATE ARRIVALS

The chancery court found that "[t]he proof at the hearing established that Ms. Elmi was late arriving at her work station on thirteen (13) separate documented occasions in 2012-2013." We have determined that the evidence in the record preponderates against this finding and merely establishes that she was late on one day, September 5, 2012. We also conclude that one incident of tardiness does not constitute insubordination. Moreover, even if it did, one incident of tardiness does not justify the dismissal of a tenured teacher. *See Williams v. Pittard*, 604 S.W.2d 845, 850 (Tenn. 1980) ("[W]e conclude that the Chancellor was correct in finding that [a tenured teacher's] tardiness was insufficient to warrant her dismissal in light of the absence of duty during the ten minute period in which she was habitually [late].").

Mr. Roney testified that he became principal of ACES during the 2012-2013 school year at which time he implemented a new policy requiring that teachers arrive at school at 7:15 a.m. and that they be in their classrooms at 7:30 a.m. to greet students. He assigned no specific duties from 7:15 a.m. to 7:30 a.m. and allowed teachers to make copies or to prepare lesson plans during that time. Mr. Roney testified that he believed this policy provided "a great academic start and personal start" to the school day.

During the 2012-2013 school year, he documented thirteen occasions when Ms. Elmi was not in her classroom:

1. September 5, 2012 – 7:21 a.m.
2. September 20, 2012 – 7:20 a.m.
3. September 26, 2012 – 7:20 a.m.
4. October 2, 2012 – 7:22 a.m.
5. October 16, 2012 – 7:25 a.m.
6. October 29, 2012 – 7:25 a.m.
7. November 7, 2012 – 7:21 a.m.
8. November 20, 2012 – 7:22 a.m.
9. December 4, 2012 – 7:20 a.m.
10. January 8, 2013 – 7:21 a.m.
11. January 11, 2013 – 7:21 a.m.
12. February 4, 2013 – 7:24 a.m.
13. March 19, 2013 – 7:21 a.m.

The most interesting, and indeed, most significant fact about each of these instances is that all of the times listed are prior to 7:30 a.m. when Ms. Elmi was not required to be in her classroom. Mr. Roney conceded to that fact in his testimony. Thus, Mr. Roney illogically assumed that because Ms. Elmi was not in her classroom by 7:15 a.m., she must not have been on school grounds at that time.

Although he never documented an occasion when she was not in her classroom by 7:30 a.m., Mr. Roney testified:

A. …But there was some instances I did find her not at her door at 7:30.
Q. And did you notify Ms. Elmi of her failure to follow that policy?
A. I did.
Q. What was her response?
A. We notified her a couple of times. And it was I'll try; we'll get it done.

However, Mr. Roney later clarified his testimony by explaining that he never discussed his concerns with Ms. Elmi directly. Instead, he sent an email to all teachers at ACES to remind them of the new policy and to urge them to be at the school at 7:15 a.m. Mr. Roney explained, "You know, we're adults. We shouldn't have to be given one-on-one conversations."

The only proof the Board relied on to establish that Ms. Elmi arrived late was Mr. Roney's testimony and his documentation that she was not in her classroom prior to 7:30 a.m. on thirteen occasions. Therefore, the Board had no proof that Ms. Elmi ever arrived late to her classroom, nor did the Board have any evidence that Ms. Elmi ever arrived late to school. Nevertheless, Ms. Elmi testified that she was late on one day, and this occurred on September 5, 2012, when a police officer pulled her over for speeding on the way to work. After receiving the speeding ticket, she told Mr. Roney that she *might* be late in the future because she had to take her daughter to school in Nashville before work.[5] However, she testified that September 5, 2012 was the only time she arrived to work after 7:15 a.m.

We also find it significant and inexplicable that Mr. Roney assigned Ms. Elmi to traffic duty from 7:00 a.m. to 7:40 a.m. for the following school year. This is inexplicable because the traffic duty assignment prevented Ms. Elmi from being in her classroom by 7:30 a.m., which as Mr. Roney testified, provided "a great academic start and personal start" to the school day. Moreover, Mr. Roney conceded that it was unusual to assign a classroom teacher to traffic duty because it prevented the teacher from being in her

---

[5] Ms. Elmi testified that after being late on September 5, she attended a staff meeting where Mr. Roney reminded teachers about the 7:15 a.m. arrival policy. She approached Mr. Roney after the meeting to discuss her concerns:

I went up to him after the meeting and said that I drop my daughter off at school in Nashville at 6:45, generally—which was an hour before her school started and I just didn't think I could drop her off any earlier—and then I come flying to school. And he said, "Then don't speed; you've already got a speeding ticket." I said I would be here at 7:15. I may be parking my car, but I would be at school at 7:15. He said that was all right, he wasn't really talking about me; but that it was these teachers that lived nearby that were still coming in late.

classroom at 7:30 a.m. However, as discussed in more detail below, he did so in Ms. Elmi's case because he thought it would force her to be on time, and it is undisputed that Ms. Elmi arrived on time every day during the 2013-2014 school year.

The traffic duty assignment is also problematic because Tenn. Code Ann. § 49-2-303(b)(3) and (7) clearly state that this non-instructional duty should not be assigned to a licensed teacher. To make a bad idea worse, because Ms. Elmi could not be in her classroom when her students arrived at 7:30 a.m., Mr. Roney had to assign a school staff member to greet Ms. Elmi's students each morning, which caused problems on more than one occasion. This is evidenced by an email Ms. Elmi sent to Mr. Roney on October 30, 2013:

> [Y]esterday when I came in from morning duty my students were in the classroom without adult supervision. The students have been told to wait in a line outside the door until an adult is there. Another teacher told them to go in. She propped open her door and my door and walked between the two classrooms. I appreciate her efforts but am still uncomfortable with this. Four of the students…have emotional issues. Who knows what could set them off? (Earlier in the year ___ took her scissors and cut up her pants. This happened on a morning when the students went into the room without an adult.) I also have one student who steals. Is there a way to make sure that the students are supervised when Mrs. Harlinger is not here?

Mr. Roney acknowledged receiving the email and admitted that he did not respond to it. Moreover, he could not recall if he ever addressed Ms. Elmi's concerns about the lack of supervision in her classroom during arrival time.

In a colloquy concerning the year-long traffic duty assignment and the fact that it prevented Ms. Elmi from being in the classroom at 7:30 a.m., Mr. Roney was asked and answered as follows:

> Q. … Do [teachers] have duties that require them not to be able to greet their students at 7:30 a.m.? I'm talking specifically about classroom teachers.
> A. No. However, did I fix the coming in tardy?

Mr. Rony's reply to the question confirms the obvious—that Mr. Roney's goal was to control a teacher even though "the fix" he chose was to the detriment of the students' educational interests. It is, therefore, apparent that Mr. Roney's "rule" that teachers be in the classroom by 7:30 a.m., the purpose of which was to provide "a great academic start" to the school day, was a ruse, at least as it applied to Ms. Elmi. This is evident because his "fix" prevented her from fulfilling the reasonable purpose of the rule, which was to provide a "great academic start" to the school day. *See* Tenn. Code Ann. §

- 10 -

49-5-501(7)(A) ("Refusal or continued failure to obey . . . [or] to comply with the rules and regulations of . . . the principal . . . when the rules, regulations and assignments are *reasonable* and *not discriminatory*." (emphasis added)). Therefore, we conclude that the "7:30 a.m." rule as applied to Ms. Elmi was not reasonable and the application of the rule was discriminatory. *See id.* Consequently, her alleged violation of that rule cannot constitute an act of insubordination. *See id.*

We have also determined that the evidence preponderates against the trial court's finding that Ms. Elmi was late for work on thirteen occasions. In fact, she was only late for work on one occasion. Moreover, she provided an explanation; thus, her tardiness on that one occasion was not an act of insubordination. Even if we were to consider her tardiness on one day as an act of insubordination, one minor act of insubordination would not warrant her dismissal. *See Ripley v. Anderson Cty Bd. of Educ.*, 293 S.W.3d 154, 161 (Tenn. Ct. App. 2008) (Stating that a tenured teacher may not be dismissed based on one minor incident of insubordination.)

## B. Failure to Enter Grades

The chancery court found that Ms. Elmi failed to enter grades as required by school policy during the 2012-2013 school year. The court stated that "[w]hile Ms. Elmi's explanation for the delay in the 2012-2013 school year resulted from her hospitalization," she also failed to enter grades on two occasions during the 2013-2014 school year. The evidence does not preponderate against the finding that Ms. Elmi failed to post grades in a timely manner during the 2012-2013 school year. Nevertheless, we have determined that this circumstance is excusable; therefore, it does not constitute an act of insubordination.

During the 2012-2013 school year, Mr. Roney instituted a policy that required teachers to post two grades per student each week. Mr. Roney explained the reason for this policy:

> [We] have to take into consideration the feeling of parents. If we get to the end of the grading period and a child has—let's say an "F," but the child only has three grades entered, there's not a lot of backing. There's not a lot of support for that bad or failing grade. So it—what I deem necessary at our school—the policy I put in place when I got there is if you do two grades a week, there's nine weeks, so that should be a minimum of 18 grades per grade/per subject. When that happens, and a student is failing or have a bad grade, then you have substantiation. You have justification for that grade.

- 11 -

On April 3, 2013, Mr. Roney issued a letter of concern to Ms. Elmi because she did not have the required number of grades entered for her students. Mr. Roney conceded that prior to the letter, Ms. Elmi had been absent from school for a week due to an illness. He also conceded that after he issued the letter of concern, Ms. Elmi entered all of her grades.

Ms. Elmi provided a reasonable explanation for not posting the required number of grades in a timely fashion. As she explained, she was hospitalized from February 28 through March 5, 2013 and could not return to work until March 11. Her students' grades were entered and current up to the time of her hospitalization in February. During Ms. Elmi's absence, a substitute teacher taught her class, and the substitute did not have access to the system to enter student grades. When Ms. Elmi returned to work on March 11, report cards were due in two days. She finished the report cards by the deadline despite having a number of other tasks to complete. She testified, "Typically you come back—especially after an extended absence, and you have piles and piles of papers to grade. And then as I'm grading you realize some things need to be re-taught. You can't really enter that grade if it's not a fair assessment."

As for the 2013-2014 school year, Mr. Roney testified, "I know at least two occasions during the 2013/14 school year that I noticed, there again, we had an inadequate number of grades entered for Ms. Elmi." Nevertheless, Mr. Roney did not issue a letter of concern for her failure to enter grades during that school year, nor did he bring the matter to Ms. Elmi's attention. Moreover, Mr. Roney could not provide any other specifics about Ms. Elmi's failure to enter grades during the 2013-2014 school year. Ms. Elmi testified that she fully complied with the grade policy throughout the 2013-2014 school year. She also confirmed the fact that she received no letters of concern regarding her failure to do so for the 2013-2014 school year.

Insubordination is defined as the "[r]efusal or continued failure to…comply with the rules and regulations of the board or to carry out specific assignments made by the …principal." Tenn. Code Ann. § 49-5-501(7)(A). Failing to post grades while in the hospital for a week and for a brief period after returning to work does not prove that one has refused to comply with the grade policy. Moreover, it is not proof of continued failure to comply with the policy. Thus, Ms. Elmi's failure to post grades on time after being in the hospital does not constitute insubordination. Moreover, Ms. Elmi testified that she understood the purpose for the policy was to give parents a fair and accurate picture of their children's progress, and she intended to comply with it.

As for the 2013-2014 school year, Mr. Roney testified that Ms. Elmi failed to enter grades "on at least two occasions;" however, he did not recall the dates and he had no documentation concerning these alleged incidents. Moreover, Mr. Roney did not issue a letter of concern as he had the previous school year for the same infraction. Ms. Elmi testified that she entered grades pursuant to school policy during the 2013-2014 school

year. Based on Mr. Roney's vague and unsubstantiated testimony, which is contradicted by Ms. Elmi's unequivocal testimony, we find the evidence preponderates against the chancery court's finding that Ms. Elmi failed to post grades in accordance with the policy during that school year.

We also find it significant that the notice of charges makes no mention of Ms. Elmi's failure to enter grades during the 2013-2014 school year. Under the Tenure Act, the Board cannot dismiss a tenured teacher unless it provides the teacher with a written copy of the charges, "specifically stating the offenses that are charged." Tenn. Code Ann. § 49-5-511(a)(4) and (5). Thus, the alleged failure to post grades during the 2013-2014 school year cannot serve as a basis for Ms. Elmi's dismissal.

For the foregoing reasons, the Board did not prove insubordination based on Ms. Elmi's failure to follow the grade policy.

C.     FAILURE TO FOLLOW THE PRINCIPAL'S EXACT INSTRUCTIONS

The chancery court ruled that Ms. Elmi was insubordinate for not following Mr. Roney's "exact instructions" regarding an unruly student. The court made the finding that Mr. Roney had "several discussions" with Ms. Elmi beginning in March regarding the handling of the "unruly student," and that "Ms. Elmi did not follow his exact instructions." We have determined that the evidence preponderates against this finding and that her actions did not constitute insubordination.

Ms. Elmi had a student in her class during the 2013-2014 school year who had behavioral problems. In March 2014 Ms. Elmi asked Mr. Roney for advice about how to handle the student. Mr. Roney told Ms. Elmi to call the child's grandmother because the grandmother wanted to be informed of any problems.

On the morning of April 29, Ms. Elmi came to Mr. Roney's office and informed him that the child had been "out of control" the previous day. Mr. Roney again instructed Ms. Elmi to call the grandmother, and Ms. Elmi called the child's grandmother that afternoon. As she explained in her testimony:

> So I called [the grandmother]. I said this is what [the child is] doing; I tried everything I know how to do—what's worked before, and I can't get him to stop. And she said, "Well, he had some Benadryl. He's been taking Benadryl. I wonder if that's what the problem is." I said, "I don't know. All I know is I just can't get him to stop doing that." She said, "Well, I'll come and get him." I said, "That's up to you. I'm just telling you. I want you to know."

Ms. Elmi sent the child to the office, and the grandmother took the child out of school. Ms. Elmi received a voice message on her cell phone from the grandmother later that day. She said the grandmother "was yelling that I—he wasn't out of control and she had—nothing was wrong with him. He could walk down the hall, and she thought I didn't want to fool with him. It was a pretty long message." Ms. Elmi told Mr. Roney about her conversation with the grandmother and let Mr. Roney listen to the grandmother's message. Mr. Roney testified that in the message the grandmother complained that Ms. Elmi told the grandmother to remove the child from school because the child was "out of control."

Later Mr. Roney had a conversation with the grandmother, and the grandmother told Mr. Roney that she received a call from Ms. Elmi letting her know that the child was "out of control." The grandmother told Mr. Roney that Ms. Elmi ordered her to come get the child, and she did, though the grandmother did not feel it was necessary.

Based on his conversation with the grandmother, Mr. Roney issued a letter of reprimand to Ms. Elmi on April 30, 2014, which stated in pertinent part:

> On April 29, 2014, you came into my office explaining to me that a child was "out of control" the day before. I asked you if you called his Grandmother (Legal Guardian) as per our conversation in March. You told me that you did not call the Grandmother. I explained to you for the second time to call the Grandmother and keep her informed of the child's behavior. When the child acted up again later on April 29, 2014, you called the Grandmother to inform her that her child was "out of control" and that she needed to come get him.

> Our policy does not give teachers the authority to order Parents/Guardians to remove students from school. Moreover, this problem could have been eliminated if you would have followed instructions to keep in contact with parents when behavior problems arise.

On cross examination, when asked to clarify his reason for issuing the letter of reprimand, Mr. Roney stated, "What she's being written up for mainly is for sending the kid home." As he explained it, teachers do not have the authority to send a child home, only he has that authority. He further explained that Ms. Elmi's failure to call the grandmother on April 28, 2014 after he told her to do so in March "probably factored in," but the main reason for the reprimand was that Ms. Elmi told the grandmother to pick up the child.

Mr. Roney invited Ms. Elmi to provide a letter of explanation of the incident. She did so and submitted it to Mr. Roney to place in her file. In the letter Ms. Elmi stated that she always kept the grandmother informed about the child, though Ms. Elmi preferred to

speak to the grandmother in the evenings and not during school hours. Ms. Elmi explained in her letter, "On [two] occasions when I have called [the child's grandmother during school hours] I have had to leave a message. She came to school when she saw I had called even though it wasn't necessary." Ms. Elmi also denied ever ordering the grandmother to remove the child from school.

The chancery court found that the proof established that Mr. Roney had "several discussions" with Ms. Elmi beginning in March regarding the handling of an "unruly student," and that "Ms. Elmi did not follow his exact instructions." However, the chancery court did not find that Ms. Elmi instructed the grandmother to remove the child from school.[6]

We have determined that the evidence preponderates in favor of the finding that Ms. Elmi did not call the grandmother on April 28 as Mr. Roney had expressly instructed her to do in March; however, this is a minor incident and not worthy of dismissal or any serious form of discipline. *See Fleming v. Wade*, 568 S.W.2d 287, 290 (Tenn. 1978) (The appellate court concurred in the chancellor's findings as to grounds but concluded that the evidence against tenured teacher was not sufficient to justify dismissal). Moreover, when the child misbehaved on April 28, instead of calling the grandmother, Ms. Elmi consulted with Mr. Roney the following day. While Ms. Elmi may not have followed Mr. Roney's instructions exactly, we see no error with her decision to consult with Mr. Roney before calling the grandmother. Moreover, she did call the grandmother after consulting with Mr. Roney on April 29.

More significantly, as noted earlier, the statutory definition of insubordination is when a teacher refuses to comply with the instructions of a principal or continually fails to obey the principal's instructions. We find no evidence that Ms. Elmi refused to call the grandmother and no evidence that she repeatedly failed to call the grandmother. *See* Tenn. Code Ann. § 49-5-501(7)(A) ("Refusal or continued failure to obey . . . [or] to comply with the rules and regulations of . . . the principal . . . when the rules, regulations and assignments are reasonable and not discriminatory."). Thus, the fact Ms. Elmi failed to call the grandmother on April 28, but instead chose to consult with Mr. Roney on April 29, does not constitute an act of insubordination as that term is defined in the Tenure Act.

We also find it relevant that Mr. Roney admitted in his testimony that the failure to call the grandmother as he had instructed was not the reason for the letter of reprimand. The reason for the reprimand was that Ms. Elmi allegedly ordered the grandmother to remove the child from school, and there is no competent evidence to support this allegation. The only testimony on this point is Mr. Roney repeating what the grandmother

---

[6] The chancery court concluded that it could not make a finding as to whether Ms. Elmi did nor did not instruct the grandmother to remove the child from school.

told him, which is classic inadmissible hearsay. *See* Tenn. R. Evid. 801(c) ("Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Moreover, it does not qualify for any exception to the hearsay rule. *See* Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."); *see also* Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence § 8.01[3][c], at 8-12 (6th ed. 2013) (discussing the unreliability of hearsay evidence).

The only competent evidence on this point is that of Ms. Elmi who stated that she did not instruct the grandmother to remove the child from school. Thus, Ms. Elmi's testimony that she did not instruct the grandmother to remove the child from school is uncontroverted. As we noted earlier, the chancery court did not find that Ms. Elmi ordered the grandmother to remove the child from school.

Even if Ms. Elmi was insubordinate by refusing to obey the principal's instructions in April, one minor incident of insubordination is insufficient to dismiss a tenured teacher. In *Ripley*, 293 S.W.3d at 160-161, the Anderson County School Board dismissed a tenured teacher for insubordination because she played a song for her middle school class which addressed inappropriate and controversial topics in violation of school policy. Ms. Ripley also damaged her students' class projects and threw books and backpacks out of frustration. *Id.* at 155. This court held that while Ms. Ripley's conduct "may have called for some type of discipline, we cannot agree that her conduct warranted the drastic action of termination of her employment." *Id.* at 161. Likewise, we have determined that Ms. Elmi's failure to follow Principal Roney's instruction on one occasion, possibly two, does not warrant her dismissal for insubordination under the Tenure Act.

The chancery court found the evidence established three separate grounds of insubordination. To be insubordinate, a teacher must refuse or continually fail to obey or to comply with a rule or to carry out specific assignments made by the principal, provided the rules and assignments are reasonable and not discriminatory. Tenn. Code Ann. § 49-5-501(7)(A). This record failed to establish that Ms. Elmi refused or continually failed to obey any rule or that Ms. Elmi refused or continually failed to carry out specific assignments made by Mr. Roney. It only established that Ms. Elmi failed to carry out one specific assignment by Mr. Roney—to call the grandmother following a meeting he had with Ms. Elmi in March. Therefore, there is no basis in fact or law upon which to dismiss Ms. Elmi on the grounds of insubordination.

IV.    INEFFICIENCY

A teacher may only be dismissed or suspended on the basis of incompetence, *inefficiency*, neglect of duty, unprofessional conduct, or insubordination. Tenn. Code Ann. § 49-5-511(a)(2). Under the Tenure Act, "inefficiency" means

being below the standards of efficiency maintained by others currently employed by the board for similar work, or habitually tardy, inaccurate or wanting in effective performance or duties. The definition of inefficiency includes, but is not limited to, having evaluations demonstrating an overall performance effectiveness level that is "below expectations" or "significantly below expectations" as provided in the evaluation guidelines adopted by the state board of education pursuant to § 49-1-302.

Tenn. Code Ann. § 49-5-501(6).

The Board based the charge of inefficiency "on evaluation scores below expectations for two consecutive years with a plan of assistance placed on October 28, 2013." Ms. Elmi's evaluation score for the 2012-2013 school year fell below expectations, and she was required to improve her score by April 1, 2014, near the end of following school year. Although the chancery court acknowledged that the Board did not have a complete evaluation score for Ms. Elmi by April 1, 2014, the court held that the proof established that Ms. Elmi had two consecutive years of evaluations falling below expectations. We have determined that the evidence preponderates against this finding.

A teacher's evaluation score consists of several components. Tenn. Code Ann. 49-1-302(d)(2). Fifty percent is based on multiple criteria, including review of prior evaluations, personal conferences, and *classroom observations*. *Id*. Thirty-five percent is based on student growth data as represented by the Tennessee Value-Added Assessment System (TVAAS). *Id*. Fifteen percent is based on other measures of student achievement.[7] *Id*.

The proof established that Ms. Elmi had two consecutive years of below average classroom observation scores. Significantly, however, her classroom observation score, which was based in principal part on Mr. Roney's evaluations, was the only category for which her scores fell below expectations for two years.[8] Both Ms. Elmi and Mr. Roney testified that a score of "3" was "at expectations." As we discuss in more detail later, all of Ms. Elmi's other scores for the 2013-2014 school year were "at expectations." Moreover, the classroom observation score, along with prior evaluations and personal conferences, comprise only fifty percent of a teacher's evaluation score.

---

[7] TVAAS measures student growth using data from standardized tests. *See* the Tennessee Department of Education website at www.tn.gov/education/topic/tvaas.

[8] This score also included some observations by another administrator, Mr. John Dyce.

- 17 -

Mr. Roney acknowledged that a teacher's overall evaluation score is based on three components: Fifty percent on classroom observations, thirty-five percent on student growth, and fifteen percent on other factors. Mr. Roney also explained that ACES tested student growth in two ways. In kindergarten, first, and second grades, the school administered a test called the SAT 10, and in third and fourth grades, the school used TCAP. On cross-examination, Mr. Roney testified:

> Q. Now, the goal for Carlisa Elmi is to increase that average on the TEAM Evaluation Model[9] to 3.0 by April 1, 2014. Am I reading that correctly?
> A. You are.
> Q. Problem is, has TCAP or any of those other tests even happened at that time?
> A. Not for the—no, it hasn't.
> Q. So, you really can't have an overall score by April 1, 2014, can you?
> A. You can. Based on your evaluations you can.
> Q. *Only on the evaluations?*
> A. *Yes*.
> …
> Q. *You're not testifying about her end of the year testing or anything like that, are you?*
> A. *Not at this time. Because it hadn't happened by April 1st. You're right.*

(Emphasis added).

When questioned about the scores and whether he had any documentation to support his testimony, Mr. Roney admitted that he did not have any documentation with him at the hearing. Later in the hearing, the Board produced a document that appeared to have Ms. Elmi's complete evaluation scores for the 2013-2014 school year, although Mr. Roney did not explicitly testify to that fact. The document listed scores for Ms. Elmi in five categories. For the 2012-2013 and 2013-2014 school years, Ms. Elmi's scores were documented as follows:

|  | 2012-2013 | 2013-2014 |
|---|---|---|
| **Achievement Score** (School-Wide TVAAS: School-Wide: Composite): | 1 | 3 |
| **Growth Score** (School-Wide Composite): | 1 | 3 |

---

[9] Neither party defined "TEAM Evaluation Model."

| | | |
|---|---|---|
| **Individual Growth Score** | 1 | 3 |
| **Overall Observation Average** | 2.68 | 2.55 |
| **Educator Effectiveness Score** | 1 | 3 |

In four of the five categories, Ms. Elmi's scores increased, and significantly, the only score that fell below the acceptable average of "3" was the score that was principally based on Mr. Roney's observations. Specifically, her scores increased in four categories from a "1" for the 2012-2013 school year to a "3" for the 2013-2014 school year, while her classroom observation score decreased from a 2.68 for the 2012-2013 school year to a 2.55 for the 2013-2014 school year.

Ms. Elmi's average classroom observation score for the 2012-2013 school year was 2.68. On October 22, 2013 of the following school year, Mr. Roney implemented a plan of assistance ("POA") for Ms. Elmi to improve her performance in the classroom. The POA stated that the goal was for Ms. Elmi to increase her "TEAM Evaluation Model" average to a 3.0 by April 1, 2014. Ms. Elmi testified that she completed all tasks required of her under the POA to improve her observation score, but that the administration did not do its part to assist her. For example, the POA required Ms. Elmi to meet with Mr. Roney biweekly during the third grading period of the 2013-2014 school year to receive constructive feedback. Ms. Elmi tried to set up a meeting with Mr. Roney by sending him an email but Mr. Roney never responded.

Despite getting very little support from the administration, Ms. Elmi testified that her educator effectiveness score increased from a "1" for the 2012-2013 school year to a "3" for the 2013-2014 school year. We also find it significant that the chancellor agreed with Ms. Elmi, finding that "Ms. Elmi did perform tasks assigned to her [under the POA] but the Administration failed to follow up on all obligations assigned to it under the plan." Also significant is that the Board does not dispute this finding.

We also find it most unusual that Mr. Roney identified Ms. Elmi as a teacher in need of assistance at the end of the 2012-2013 school year; yet, he placed her on traffic duty for the entire 2013-2014 school year. This assignment prevented her from being in the classroom when her students arrived in the morning. Thus, by his own actions, Mr. Roney denied Ms. Elmi "a great academic start and personal start" to the school day. As stated previously, the traffic duty assignment worked not only to Ms. Elmi's detriment but also to her students' detriment. It also begs the question posed by Ms. Elmi—why should she be "left to bear the entire consequence of the Administration's failures based on a charge of inefficiency," particularly when Mr. Roney interfered with her efforts to improve?

We additionally find it unusual that the notice of charges expressly stated that the charge of inefficiency was "based on evaluation scores below expectations for two consecutive years with a plan of assistance placed on October 28, 2013." Ms. Elmi was to have improved her evaluation results by April 1, 2014, but the TVAAS component of her evaluation, comprising thirty-five percent of her overall evaluation score for the 2013-2014 school year, was not yet available. Further, it was not available by May 15, 2014 when Ms. Elmi was charged with inefficiency. Thus, she was charged with inefficiency based on evaluation scores falling below expectations for two consecutive years, though the evaluation for the second year was not complete or available.

As Ms. Elmi notes in her brief, the Board attempted to excuse itself from this shortcoming by stating that the improvement as set out in the POA pertained only to the "observation" component of Ms. Elmi's evaluation. We are not persuaded. As Ms. Elmi notes in her brief, although it may be acceptable for a principal to target only the classroom observation component of an evaluation in establishing goals for a POA, it is not a substitute for a charge of "inefficiency" under the Tenure Act.

The Tenure Act defines "inefficiency" as having "evaluations demonstrating an overall performance effectiveness level that is 'below expectations' or 'significantly below expectations' as provided in the evaluation guidelines adopted by the state board of education pursuant to § 49-1-302." Tenn. Code Ann. § 49-5-501(6). Thus, the definition itself makes clear that inefficiency is to be determined based on "evaluations demonstrating an overall performance effectiveness." Nevertheless, the Board apparently seeks to modify the statutory definition by basing inefficiency on the classroom observations by the school's administration. We believe this is contrary to both the letter and the spirit of the Tenure Act. As is stated eloquently in Ms. Elmi's brief:

> If a school district is permitted to make high-stakes employment decisions based solely on a single criteria of an evaluation that is required by law to include multiple criteria, each bearing a certain percentage of the overall evaluation result, then the objective of an evaluation system with multiple criteria will be thwarted. If a school district is permitted to determine that a tenured teacher is "inefficient" based solely on a single criteria of an evaluation that is required to include multiple criteria, then the definition of "inefficiency" in the Tenure Act as it relates to evaluations will be meaningless. A charge of "inefficiency" based on evaluation results must look to the teacher's overall performance effectiveness level, not just to one isolated component of the evaluation criteria, in order to comport with both Tenn. Code Ann. § 49-1-302(d)(2)(A) and Tenn. Code Ann. § 49-5-501(6). The charge of "inefficiency" based solely on the observation component of Ms. Elmi's evaluation elevates that single criteria to a level of importance it cannot occupy under these statutes.

The record fails to establish the ground of inefficiency. The chancery court found that Ms. Elmi had two consecutive years of evaluations falling below expectations. However, the record established that Ms. Elmi improved in four out of five categories from the 2012-2013 school year to the 2013-2014 school year. Her only deficiency—below-average classroom observation scores—was due, in part, to Mr. Roney assigning Ms. Elmi to traffic duty for the entire school year and to the administration failing to perform the tasks required of it under the POA.

**IN CONCLUSION**

The judgment of the chancery court is reversed and this case is remanded for further proceedings as may be necessary and consistent with this opinion including a determination of whether Ms. Elmi is entitled to an award of back pay without offset pursuant to Tenn. Code Ann. § 49-5-511(a)(3) among other relief. Costs of appeal are assessed against the Cheatham County Board of Education.

_____
FRANK G. CLEMENT JR., P.J., M.S.