IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 10, 2024 Session

## LAGINA SCOTT v. SHELBY COUNTY BOARD OF EDUCATION, ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH-19-0492     Jim Kyle, Chancellor**
_____

**No. W2022-00914-COA-R3-CV**
_____

This appeal arises from the termination of a tenured teacher. The trial court determined that the school district terminated the teacher without legal cause and ordered that she be reinstated with backpay but denied her request for attorney's fees. Finding that the teacher waived any issue pertaining to whether the school board followed the procedural requirements of the Teacher Tenure Act, and that she engaged in conduct which constituted two of the three charges levied, we affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

S. Keenan Carter, Gadson W. Perry, and Andrew B. Schrack, Memphis, Tennessee, for the appellants, Shelby County Board of Education, Michelle Robinson McKissack, Althea Greene, Stephanie P. Love, Kevin Woods, Scott McCormick, Shante K. Avant, Miska Clay-Bibbs, William "Billy" Orgel, and Joyce Dorse Coleman.

Darrell J. O'Neal and Laura Smittick, Memphis, Tennessee, for the appellee, Lagina Scott.

## OPINION

## I. FACTS & PROCEDURAL HISTORY

This appeal arises from the termination of a school counselor, Ms. Lagina Scott, the appellee, by the Shelby County Board of Education ("SCBE"), one of the appellants. Her termination was caused by her performance over the course of the 2017-2018 school year. At the end of that year, approximately 14 students were unable to graduate on time due to "counselor error."

Ms. Scott began working at Southwind High School ("SHS") as a guidance counselor during the 2014-2015 school year and, by the time of the hearing, had been working for SCBE in some capacity for more than 12 years. As a guidance counselor, Ms. Scott was required to monitor students' academic progress to ensure they met the requirements set by the State of Tennessee to graduate and to provide students with social, emotional, and academic support. The counselors at SHS used a system in which they worked with a single class of students during the entire course of that class's high school career. A counselor would be assigned to work with a class of students, usually the freshmen class, then would continue to work with those students as sophomores, juniors, and seniors. Ms. Scott began by counseling the SHS freshmen class in 2014 and worked with that class through their senior year, the 2017-2018 school year.

The issues leading to Ms. Scott's dismissal appear to have begun during the 2016-17 school year. Ms. Scott took two periods of leave pursuant to the Family and Medical Leave Act ("FMLA") over the course of that year, working a total of only 57 days. In September 2016, Ms. Scott's son suffered a broken arm and Ms. Scott took her first period of leave to provide care to him. Ms. Scott returned from this period of leave on October 31, 2016. While on leave, Ms. Scott was referred to SCBE labor relations due to allegations made by a parent. When she returned to work, she learned the referral was due to allegations that she had contacted the parent, posed as a member of SHS administration, and threatened legal action for that parent's child having caused her son's broken arm. Ms. Scott was required to meet with an employee relations manager in regard to this incident, but no other discipline appears to have been pursued. Ms. Scott began her next period of leave on January 11, 2017. Ms. Scott had been in a car accident during the winter break, and shortly after the new semester began, she was in a second car accident. She stated that these two accidents combined with the stress of the prior referral incident led her to take "stress leave" beginning on January 11, 2017, and continuing for the remainder of the school year.

SHS hired a substitute guidance counselor, Ms. Zekaya Good, on February 22, 2017. Over the course of her first week, Ms. Good conducted a transcript audit of the then-junior class. During this audit, Ms. Good found issues, such as students missing records, credits not adding up properly, and certain students having failed classes during the first semester who had not been placed in credit recovery. She reported these issues to SHS administration. After this, Ms. Good created binders which contained a transcript, two transcript audits, a four-year plan, and a course selection sheet for each student. At the end of the 2016-2017 school year, Ms. Good left these binders at the school for whoever was serving as counselor during the next year to use in formulating students' schedules. Ms. Good's role as substitute counselor concluded in June 2017. However, she was rehired by the school and began working as the virtual school coordinator in September 2017.

Meanwhile, Ms. Scott returned to work at SHS on July 17, 2017. When she

returned, Ms. Scott found she was unable to access either her email or the school's student management system. She contacted SHS administration and found that she was without access due to not having completed required training for a new system. SHS had migrated to a new student management system, PowerSchool, after the end of the 2016-2017 school year. The other counselors went through training for PowerSchool in March 2017. Ms. Scott was assigned a virtual training module upon her return so that she could begin preparing for the 2017-2018 school year. The training was required for her to have access to the software necessary to formulate student schedules and upload them to the school's master schedule.[1] Ms. Scott took between two and three days to complete this training.

On July 31, 2017, a meeting was held in which all SHS counselors were instructed to have student schedules completed and uploaded into the PowerSchool system by the end of the day on August 4, 2017. Ms. Scott contacted SHS administration on the afternoon of August 4 to inform them that she would not complete the scheduling on time. Administration then extended the deadline to 12:00 P.M. on August 5, 2017. Ms. Scott also missed this deadline, but it appears she did have the schedules completed sometime that afternoon because she sent a text message to Mr. Christopher Hardiman, who was serving as the Vice Principal at SHS at this time. She sought assistance uploading the schedules at approximately 4:41 P.M on August 5. Mr. Hardiman attempted to render assistance via text message and eventually another counselor present at SHS was able to assist Ms. Scott in uploading the schedules. After that, Ms. Scott attempted to print the schedules so that they could be distributed on the first day of school, which was the following Monday. She experienced more technical difficulties while doing so and again contacted Mr. Hardiman for assistance. Mr. Hardiman instructed her to meet him at the school at 6:00 A.M. the following Monday and they would print the schedules then. When Ms. Scott arrived at SHS that Monday, Mr. Hardiman had already printed the schedules, which she then placed in teacher boxes. Despite the schedules being completed at this time, there were various issues and class conflicts. These resulted in schedule changes still being made for students as late as October, although the add/drop deadline for the school was in September. As a result of missing these deadlines and students experiencing scheduling difficulties, Ms. Scott was referred to labor relations by Dr. Terrance Brown, the Principal of SHS. Ms. Scott met twice with Ms. Cecilia Barnes, a labor review agent, but no discipline was pursued.

Other problems were also occurring during the fall of 2017. On September 9, 2017, Mr. Hardiman called a meeting with Ms. Scott, in which he provided her with three directives to complete over the course of the school year. First, she was to conduct a transcript audit for the senior class. Next, she was to meet individually with each member of the senior class to discuss their graduation status, and finally, she was to serve as a

---

[1] A master schedule is the school wide schedule formulated by administration to display all the classes available at the school and the times at which they are held.

member of the senior cohort committee.[2] On October 16, 2017, Mr. Hardiman became the Interim Principal of SHS and the next day, he reiterated the above directives in another meeting. He also instructed Ms. Scott to provide reports in which the senior students were listed in one of three categories, those on track to graduate, those who could graduate if certain conditions were met, and those with no chance to graduate. Mr. Hardiman later sent Ms. Scott a memorandum which directed, among other things, that the transcript audit was to be completed and used to compile this report on student graduation status by October 28, 2017. The memorandum also instructed her to conduct the one-on-one meetings with members of the senior class by December 8, 2017.

In February 2018, well past the December deadline, Ms. Scott began conducting the one-on-one meetings with members of the senior class. Over the course of these meetings, she became aware of some errors present on students' transcripts and noticed many students had not been enrolled in all the classes necessary to graduate. After this, she contacted at least two teachers and attempted to enroll students in their classes approximately five weeks into the spring semester. This was done without administration's approval. She also delegated some of her one-on-one meetings to Ms. Good, who began meeting with several students.

After learning of Ms. Scott's errors and of her efforts to rectify them, Mr. Hardiman reassigned her to virtual school, and an internal audit of the senior class was conducted by the other counselors at SHS. An external audit was also conducted by SCBE. These audits showed that many students were in danger of not graduating on time. Administration took various actions and enrolled students in alternative credit programs. While several students were able to finish their requirements using these programs, approximately 14 were unable to graduate on time due solely to "counselor error." Administration applied to the board of education for permission for these students to participate in the graduation ceremony so long as they signed contracts to finish their classwork over the summer. Permission was granted, and several students took part in the May 2018 graduation ceremony without having completed all the necessary classwork.

On March 29, 2018, labor relations delivered a letter to Ms. Scott informing her that she was being placed on administrative leave without pay and that a recommendation for her dismissal was going to be made to SCBE. This letter also instructed her to return any SCBE property in her possession and to contact Mr. Hardiman to schedule a time to collect her personal belongings. At some point, Ms. Scott returned to the school without having contacted SHS administration, and took everything from the office except a computer, furniture, and one of the three binders created by Ms. Good the preceding school year. Many items taken were property of SCBE and contained sensitive student information.

---

[2] The senior cohort committee is a committee intended to monitor student graduation statuses and to help the school plan its graduation by determining the number of students on track to graduate at the conclusion of the school year.

- 4 -

On May 30, 2018, Mr. Dorsey Hopson, superintendent of the Shelby County School District, sent Ms. Scott a letter which outlined the charges being brought against her (neglect of duty, insubordination, and conduct unbecoming a teacher), described the conduct which supported those charges, informed her of her rights pursuant to the Teacher Tenure Act, and stated that he was recommending that she be dismissed. Ms. Scott then requested a hearing before an impartial hearing officer in accordance with the Teacher Tenure Act. This hearing took place before Hearing Officer Debra Owen over the course of July 24, August 8, and August 9, 2018. Both SCBE and Ms. Scott called several witnesses to testify regarding the events which led to her dismissal.

Mr. Hardiman testified first. He described the periods during which Ms. Scott was absent for extended periods of school and stated that she took extended leaves of absence during both the 2015-2016 and 2016-2017 school years. He was then asked about the events of August 2017 and the subsequent issues those events caused at the school. Mr. Hardiman explained that after Ms. Scott failed to timely complete the schedules, issues persisted throughout the entire semester and that students were still being moved into classes in the middle of October despite the add/drop deadline being in September. He stated that he called a meeting on September 9, 2017, in which he gave Ms. Scott the three directives for the first time. He called a subsequent meeting with Ms. Scott on October 17, after he was named principal of SHS. He stated that during this meeting he instructed her to keep him updated with the list of students on track to graduate, those in danger of not graduating, and those who would be unable to graduate by providing an update every Friday. Mr. Hardiman also stated that he contacted Dr. Jeffery Taylor, a counseling manager for SCBE, and requested that he visit SHS sometime in early October. He said that the purpose of this visit was for Dr. Taylor to provide support to Ms. Scott and to train her on how to properly audit transcripts and use the graduation checklist.

Mr. Hardiman testified that Ms. Scott had not provided the requested report on student graduation statuses by the October 28 deadline, and that such a report was not provided until February. He also stated that Ms. Scott had not completed the student conferences by the December 8 deadline, and that Ms. Scott did not begin conducting the meetings until February 5, 2018. He also testified that there were approximately four senior cohort committee meetings, but that Ms. Scott had only attended one of them.

Mr. Hardiman was then asked about Ms. Scott enrolling students in classes during the second semester. He stated that a teacher informed him that Ms. Scott had placed a student in her English class without permission and that Ms. Scott had told her she would "hook her up" for helping her. He stated that this caused the teacher to be very uncomfortable and the action had been taken without administration's permission. The issue was compounded by the class having started approximately five weeks prior to the student being enrolled. He also testified that another teacher told him that Ms. Scott attempted to place a student in his year-long World History class at about the same time.

He also explained that it was later brought to his attention that Ms. Good had begun helping Ms. Scott perform her duties and that when he found out that he "told her that she should stop the practice." The issue was also addressed in an email Mr. Hardiman sent to labor relations in which he explained that Ms. Scott had enlisted Ms. Good to help conduct student conferences without "express oral or written permission from school administration" despite having informed some members of administration that she intended to do so. This letter also explained that Ms. Scott had actually begun the practice a week prior to informing administration of her intentions.

On cross-examination, Mr. Hardiman was asked about SHS's migration to PowerSchool. He stated that there was a training on the system that Ms. Scott missed while she was on leave but that she was provided with online training. When asked how long the training should have taken, Mr. Hardiman stated that "there were modules that would only take probably about two or three hours to complete because there were only nuances that were different between the two systems, nothing that was just greatly different." He also stated that he did not recall any system crashes or reports of system crashes on the days leading up to the August 4 scheduling deadline. He testified that Ms. Scott never requested any help creating the schedules and did not contact administration prior to telling them that she was not going to meet the August 4 deadline. He stated that, had she asked for assistance earlier, the administration would have provided it. He was also asked why the schedules were not completed at the end of the preceding school year, to which he explained that Ms. Good had left the core pieces of the schedule but that the full schedules would not run until the summer. He also explained that the SHS master schedule was mistakenly deleted in July 2017 during the PowerSchool migration and that this required all the counselors to upload schedules upon their return for the 2017-2018 school year.

During Ms. Good's testimony, she explained that she spent her first week of work in February 2017 performing a transcript audit. In that process, she went through each student's transcript and completed two forms. One form contained the overall graduation requirements for the school and the other was a "box checklist" for each semester. After this, she provided three reports to SHS administration. The first report pertained to students who were failing, the second to students who were missing information on their transcripts, and the third to students who were missing a "credit cover prevention method." She explained that many students who had failed classes in the fall semester of the 2016-2017 school year had not been placed in credit recovery and that other students' transcripts contained errors which should have been addressed in previous years. She further explained that some students had missing grades, that some had attended other schools in the past and those schools were not listed, that credits were not adding up properly, and that the largest error was "the great amount of . . . blank fill-ins in the transcript[s] and people that had failed in the first semester." She stated that this led her to begin "panicking" about students not having been placed in credit recovery.

Ms. Good stated that, prior to finishing her work as the substitute, she performed

another transcript audit, conducted individual meetings with students in which she generated a four-year plan and "register[ed] them for the next year," and created binders containing the students' information. She stated that for each student the binders contained (1) a transcript, (2) the results of the two audits, (3) the four-year plan completed in April 2017, and (4) a course registration sheet. Ms. Good stated that she left these binders in the counselor's office for whoever was serving as the guidance counselor the next year. She stated that in addition to this, she left a list of students who participated in summer school that year in order to put "the returning person on track."

Ms. Good explained that she returned to SHS the next year as the virtual school coordinator. Ms. Good was then asked about her relationship with Ms. Scott. She stated that she felt their relationship started off contentiously but that, after a productive conversation, they were on good terms by the beginning of the second semester. Ms. Good stated that Ms. Scott asked her whether she would be interested in helping her counsel some students, to which she agreed. Ms. Good stated that she later offered help when she had not heard from Ms. Scott for a period of time. She stated that this was due in part to hearing students complain about Ms. Scott not being responsive to their scheduling concerns despite approaching deadlines. She stated that, in February 2017, Ms. Scott had her go back over the transcripts and she began performing one-on-one sessions with students. Later, Ms. Scott came back to her upon obtaining "official approval" from SHS administration, she then went from conducting one-on-ones with two or three students per day to meeting with students during the entirety of several school periods in a day.

Ms. Good stated that, in April, administration asked her to move into the senior guidance counselor position as Ms. Scott was no longer at the school. Ms. Good explained that she reviewed the audits performed on the senior class by the other counselors and SCBE and that these showed that many students were missing credits due to failed classes. She also stated that a counselor's job would have been to ensure students were placed in the appropriate credit recovery courses but that these students had not been placed in the appropriate intervention. Upon being asked whether Ms. Scott had left any notes or other information in her office to help move the process along, Ms. Good stated that she "had to start from scratch" as everything had been taken from the office. She stated that two of the three binders she had compiled at the end of the preceding year were missing, but that she found one of those binders by itself in one of the closets. She stated that she was told by other teachers that Ms. Scott had not used the binders due to some sort of personal animus toward her. She also believed that Ms. Scott did not use the binders because she had been asked to find records at the beginning of the year which she recalled having placed in the binders.

Ms. Good was later asked about the usual timing of counselors preparing student schedules. Ms. Good stated that completing them at the end of a year is ideal but that at the end of the 2016-2017 school year the master schedule was not yet available. Ms. Good also stated that, as a substitute, she did not have the access to PowerSchool required to

make changes in the system. It was her intent that the binders she prepared were to show what classes a student needed. She further stated that a counselor should have been able to review those binders and generate an appropriate schedule for a student.

Ms. Cecillia Barnes also testified. She was serving as a manager of employee relations at Shelby County Schools at the time and had the responsibility of issuing employee suspensions, demotions, and terminations. She stated that SHS administrators referred Ms. Scott to her on August 7, 2017, due to her failure to complete student schedules on time. She stated that she met with Ms. Scott about the incident and the subsequent fallout twice. Ms. Barnes did not discipline Ms. Scott at the time but stated that, in retrospect, she should have done so.

Ms. Barnes stated that Ms. Scott was again brought to her attention on February 15, 2018 when Mr. Hardiman contacted her because Ms. Scott had not reported on the graduation status of the senior students and never provided a transcript audit. Mr. Hardiman further informed her that Ms. Scott had come to him in February to discuss a student who had not yet taken World History, a year-long course. This was concerning, as a student missing a year-long course in February would not be able to fulfill graduation requirements.

After this meeting, Ms. Barnes again met with Ms. Scott. She stated that she explained Mr. Hardiman's concerns about her not having performed an audit, but that Ms. Scott claimed she had begun the transcript audit in October. Accordingly, she ended the meeting as she knew that Mr. Hardiman had scheduled an outside audit of the senior class. Ms. Barnes stated that she later met with administration and the other SHS guidance counselors, who told her that a large portion of the senior class was in danger of not graduating on time, and that Ms. Scott had failed to adequately perform her duties as a guidance counselor. Ms. Barnes testified that she then prepared a letter to inform Ms. Scott that she was recommending that she be terminated. She stated that she hand-delivered this letter to Ms. Scott and her union representative.

Ms. Scott also testified at the hearing. She first explained that she had been absent from school for most of the 2016-2017 school year, working only 57 days. Ms. Scott also testified that she was present for the majority of each of the years previous, including the 2015-2016 school year. She stated that she returned to work on July 17, 2017. Ms. Scott explained that guidance counselors always returned earlier than the other teachers to "make sure schedules were in place." She also stated that schedules were ordinarily completed by the end of the preceding school year, but that when she returned her students did not have schedules in the system.

Ms. Scott then explained that, upon her return, she did not have access to the PowerSchool system because she had not yet completed the necessary training. She stated that the other counselors had been provided with training on the system the previous

semester while she was on leave, and that she was assigned a different form of online training which was challenging and not the "hands-on" training she was used to. She stated that this training took her over two days to complete, and that Mr. Hardiman's testimony that the training should have only taken a few hours and that the prior systems were similar was inaccurate as the "system was totally different." She also claimed that when she sought help from Mr. Hardiman that he responded by telling her to skip the actual training and to merely complete the required quizzes to speed up the process.

Ms. Scott stated that after she completed the training, she began reviewing the binders Ms. Good had prepared at the end of the preceding semester, but that she was unable to begin entering information into PowerSchool because the system crashed and remained down for two days. She also stated that when she was able to begin, she found errors left by Ms. Good which she was required to spend time correcting before moving onto the scheduling. Ms. Scott acknowledged that she missed the completion date for the student schedules but claimed that she had communicated with administration throughout the process.

Ms. Scott stated that later, when the schedules were submitted, more issues than were necessary arose due to the order in which the schedules were uploaded to the master schedule. She indicated that in years past, the schedules of seniors were always uploaded first to ensure that they were placed in classes required for graduation. However, this year the senior schedules were entered last and thus, there were fewer slots available for senior students. She claimed that the only reason that she could think of for this happening would have been due to "a personal issue with me and not caring about the well-being of the students." She further claimed that after the schedules were uploaded and all the conflicts became apparent, Mr. Hardiman directed her to place students in any class so long as they had a full schedule and that he did not provide assistance when she informed him that certain students were experiencing issues with their schedules. She stated that, despite these issues, each student had a schedule on the first day unless they were unregistered.

After the initial scheduling issues, Ms. Scott was referred to labor relations and she met with Ms. Barnes. She claimed that, at some point, she was informed that SHS administration had indicated that they wanted her reassigned from SHS. As a result, she felt compelled to send the text messages to Mr. Hardiman which stated that she knew he requested that she be transferred and concluded by exclaiming "CONSPIRACY!!!" Learning of the transfer request also led her to pursue a move to a different school. However, although she interviewed at other schools, she did not receive any offers of employment.

Ms. Scott disputed several other portions of the previous testimony. She stated that, while she did meet with Dr. Taylor, he did not do any "modeling" or "one-on-one training" with her, but rather merely ordered her to get her students placed in the classes necessary to graduate. Ms. Scott acknowledged that Mr. Hardiman instructed her to be a member of

the senior cohort committee. She also acknowledged that he directed her to conduct one-on-one student meetings but claimed that she informed him that she had already started conducting the meetings when the two of them met again on November 5, 2017. She also acknowledged that Mr. Hardiman asked her to compile the list categorizing students, but she claimed that he never asked her to provide a weekly report. She further stated that she was never reminded of the task, and nothing was said when she did not send a report on a weekly basis. She indicated that on November 5 she left him a note with the numbers of students in each category listed and that she compiled a full report on February 14. She stated that the project graduation[3] and virtual school programs would have still been available to students to catch up on work at that time.

Ms. Scott also stated that, in a December 18 meeting and evaluation with SHS administrator Dr. Beverly Bacchus, the deadline for the completion of the one-on-one meetings was extended to January 16, 2018.[4] She acknowledged that she missed this extended deadline but stated that it was due to school being dismissed for snow, her attendance at a mandatory counselor meeting, and the Martin Luther King Jr. holiday. She later testified that she began holding the one-on-one counseling sessions on February 5. These sessions led her to discover issues with student schedules which necessitated the placement of students into the project graduation and virtual school programs. She indicated that she requested that the enrollment deadline for virtual school be extended to February 16. She also stated that she spoke to several teachers about enrolling students into their classes, but that she only did so after having spoken to Mr. Hardiman. She denied ever making an offer to "hook up" any teacher who cooperated.

Ms. Scott stated that on February 15 all the meetings were completed but that she was called into Mr. Hardiman's office. He informed her that she was being reassigned to "virtual school seminar" and told her that a group of counselors had been compiled to review her work. She stated she relayed this to another counselor and told her that she believed "this ha[d] been a setup the whole time" and that Mr. Hardiman had "been trying [to] throw different things to try to deter or frustrate or get [her] off track."

Ms. Scott later testified about the senior cohort committee and stated that only two meetings occurred and that she had attended one of them. She claimed that she missed the other due to a conflicting meeting and that she had not been informed of the meeting early enough to have made accommodations. She also stated that administration was not as supportive of the senior cohort as they had been in previous years. She claimed that she received no assistance from administration and that when she would ask for assistance that "it was almost like they had been informed not to assist."

---

[3] Project graduation is a district-mandated support for students which allows them to make up credits by taking courses in the evenings.

[4] Ms. Bacchus testified as well and stated that the extended deadline was for January 15, 2018.

On cross-examination, Ms. Scott was asked to expand upon the text messages accusing Mr. Hardiman of engaging in a conspiracy. Ms. Scott testified that she believed that Dr. Brown, Mr. Hardiman, Dr. Bacchus, and possibly Dr. Taylor were involved in a conspiracy against her. She stated she was unsure whether Ms. Good or Ms. Barnes were involved. Ms. Scott then claimed that the testimony of SCBE's witnesses had been untruthful. Ms. Scott was later asked to identify several documents that had been obtained from the SCBE records. The first was a documented incident arising from her time at Carver High School in July 2013 which indicated that she failed to meet a deadline for completing graduation contracts for the senior class. Ms. Scott denied having seen or knowing anything about the document. When asked whether this was another person lying about her, she indicated that it was. Later, Ms. Scott was shown the memorandum which Mr. Hardiman had previously testified was a written version of the directives that he provided to Ms. Scott in the September meeting. Ms. Scott denied having ever seen the document. She further claimed that Mr. Hardiman had not provided any of the deadlines listed in the document and indicated that if a document was unsigned then she had not seen it.

Ms. Scott was then asked about the cause of the errors in the student schedules. She stated that she had not caused the errors but that she was also "not putting anything on [Ms. Good]." She was then asked whether a counselor should have caught any issues with a transcript arising from issues in a student's 9th or 10th grade year and she stated that, "you should." She then acknowledged that, despite conducting a transcript review in October 2017, she did have students who were missing classes in February 2018. She spoke specifically of a student who failed English III the year prior and blamed Ms. Good for not placing him in summer school the preceding year. However, she admitted that she missed that issue during her October transcript audit. She further stated that her failure to see issues in October led her to try and place students in classes in February. She testified that she was not required to have administration's approval to move students in classes, but that she thought Mr. Hardiman was "okay with [her plan]" and that she had informed him of the plan before moving students.

Finally, Ms. Scott was asked about the materials missing from her office after she was told to leave the school. She claimed that she was never instructed not to return to the school. She stated that she cleared out her office in April after being dismissed and that she took the binders prepared by Ms. Good and those were currently in her possession. Although she admitted that she was instructed to schedule a time with Mr. Hardiman to collect her things, she never did so. She denied that students failed to graduate due to her errors.

At the conclusion of the hearing, the parties waived closing arguments and subsequently filed competing proposed findings of fact and conclusions of law. The Hearing Officer then issued written findings of fact and conclusions of law. The Hearing Officer first addressed a late-raised argument regarding the procedural due process

requirements of terminating a tenured teacher. Specifically, Ms. Scott claimed in her proposed findings of fact and conclusion of law that SCBE did not follow the proper statutory procedure in bringing the charges. As a basis, she alleged that nothing in the letter informed her that SCBE had found that the charges warranted her dismissal and taken the necessary vote. The Hearing Officer first found that the issue had not been raised in any pre-hearing filing or at the hearing itself. The Hearing Officer determined that Ms. Scott's due process rights were not violated based on the testimony of Ms. Barnes. Ms. Barnes testified that she had delivered a letter to Ms. Scott which stated that a recommendation was going to be made to the board. Ms. Barnes also stated that the letter Ms. Scott later received from Mr. Hopson informed her of the charges and of her duties and rights pursuant to the Teacher Tenure Act and indicated that the recommendation went before SCBE. The Hearing Officer then found that Ms. Scott had engaged in neglect of duty, insubordination, and conduct unbecoming to a member of the teaching profession. Accordingly, Ms. Scott's dismissal was upheld.

Ms. Scott then sought review before SCBE. A hearing was held on January 9, 2019, in which she claimed that the Hearing Officer did not adequately weigh the extenuating circumstances surrounding the dismissal. SCBE heard arguments from each side and the board members asked several questions. At the conclusion of the hearing, the board voted to sustain the decision. Neither party addressed the due process issue during oral argument before SCBE.

Ms. Scott next filed a petition for a writ of judicial review in the Chancery Court of Shelby County on March 29, 2022. Ms. Scott claimed that her due process rights had been violated as SCBE did not provide her with notice apprising her of the fact that SCBE had voted to issue charges against her. In addition, she claimed that she did not engage in insubordination, she did not neglect her duty, and that she did not engage in conduct unbecoming to a member of the teaching profession. Ms. Scott also requested attorney's fees based on the violation of her due process rights and asked to be reinstated with backpay covering the time since her initial suspension. SCBE argued that the Hearing Officer ruled correctly as to the charges against Ms. Scott. SCBE also argued that Ms. Scott's due process argument was not properly before the court because it had not been properly raised at the administrative level and, even if it had, that SCBE complied with the statutory due process afforded by the Teacher Tenure Act.

On June 10, 2022, the trial court entered an order granting Ms. Scott's petition. The trial court found that Ms. Scott did not neglect her duty because she had asked for assistance from administration which she did not receive. The court stated, "[t]his [was] a case of bad management" because "SCBE did not give [Ms. Scott] the help or support that they should have provided." The trial court also found that Ms. Scott did not engage in insubordination as "Ms. Scott could not follow her duties because SCBE did not provide her with adequate training on the PowerSchool program, which was a program necessary to do her job." The trial court also determined that Ms. Scott's conduct did not amount to

conduct unbecoming to a member of the teaching profession. The trial court pointed out that SCBE's argument for this charge was based solely on "unreliability" and that there was no Tennessee case law supporting a termination solely on unreliability. The trial court further stated that, while unreliability is listed in Tennessee Code Annotated section 49-5-501(3) as an example of conduct constituting conduct unbecoming to a member of the teaching profession, each of the other acts listed in the statute required the actor to "exhibit malicious or even criminal intent." The trial court stated that, "[a]rguably, the 'unreliability' that the statute aims to prohibit must rise to the same level of malfeasance and culpability." The trial court found that Ms. Scott's failure to meet deadlines did not rise to the serious level of intent the statute "appears to require." The trial court stated that, having found that SCBE had unlawfully dismissed Ms. Scott, it was unnecessary to address Ms. Scott's due process claim. The trial court also did not rule on the issue of backpay.

SCBE appealed the matter to this Court on July 7, 2022. We remanded the case to the trial court on February 13, 2023, after determining that the trial court's order did not constitute a final judgment on the matter because the writ included claims for backpay and attorney's fees which were not adjudicated in the order. Accordingly, the trial court entered a post-remand order on March 15, 2023, in which it awarded Ms. Scott backpay in the amount of $400,596.40 based on her wages at the time of her termination. The trial court denied Ms. Scott's request for attorney's fees.

## II. Issues Presented[5]

The appellants have presented the following issues on appeal which we have slightly reframed:

1. Whether the trial court erred when it found that Ms. Scott had been terminated without legal cause and ordered that she be reinstated.
2. Whether the trial court erred when it awarded Ms. Scott backpay in the amount of $400,596.40 despite the lack of evidence in the record as to Ms. Scott's salary at the time of her termination.

In addition to answering the appellants' issues, Ms. Scott raised the following issues on appeal, which we have slightly reframed:

---

[5] Ms. Scott also argues in the body of her brief that SCBE's decision was arbitrary. However, Ms. Scott did not raise this issue in her petition for judicial review filed in the trial court, or in the proceedings before the trial court. A chancery court's review under the Tenure Act is "limited to the issues before the court." *Finney v. Franklin Special Sch. Dist. Bd. of Educ.*, 579 S.W.3d 633, 677 (Tenn. Ct. App. 2018). In a teacher tenure matter, the plaintiff's petition for judicial review presents "the issues for review." *Cooper v. Williamson Cnty. Bd. of Educ.*, 746 S.W.2d 176, 182 (Tenn. 1987). Because Ms. Scott did not claim SCBE acted arbitrarily in her petition for relief or in the other proceedings before the trial court, we deem the issue to have been waived as beyond the pleadings.

1. Whether the trial court erred when it found that Ms. Scott's procedural due process rights were not violated.
2. Whether Ms. Scott is entitled to an award of attorney's fees based on the violation of her due process rights.

For the following reasons, we affirm in part and reverse in part.

## III. Discussion

### A. Standard of Review

A tenured schoolteacher who has been terminated from his or her employment by a school board has "the right to judicial review of the school board's decision" pursuant to Tennessee Code Annotated section 49-5-513 (2012). *Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 139-40 (Tenn. 2017). The teacher may seek this review by filing a "petition for a writ of certiorari from the chancery court of the county where the teacher is employed." Tenn. Code Ann. § 49-5-513(a). During such review, a chancery court is permitted "to address the intrinsic correctness of the school board's decision." *Emory*, 514 S.W.3d at 141. The chancery court's review of these matters, "'is a de novo review wherein the chancery court does not attach a presumption of correctness to the school board's findings of fact, nor is it confined to deciding whether the evidence preponderates in favor of the school board's determination.'" *Id.* at 141-42 (quoting *Ripley v. Anderson Cnty. Bd. of Educ.*, 293 S.W.3d 154, 156 (Tenn. Ct. App. 2008)). The chancery court's review "is limited to the record of the school board proceedings." *Id.* at 142. "New evidence is only admissible 'to establish arbitrary or capricious action or violation of statutory or constitutional rights by the board.'" *Id.* at 142 (quoting Tenn. Code Ann. § 49-5-513(g)).

If a party is dissatisfied with the decision of the chancery court, they "may appeal as provided by the Tennessee rules of appellate procedure, where the cause shall be heard on the transcript of the record from the chancery court." Tenn. Code Ann. § 49-5-513(i). An appellate court's review of the chancery proceedings is conducted pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure, "to determine whether the evidence preponderates in favor of the chancery court's findings of fact." *Emory*, 514 S.W.3d at 142 (*citing Ripley*, 293 S.W.3d at 156). Issues of law "are reviewed de novo, with no presumption of correctness in the chancery court's conclusions." *Id.* (*citing Ripley*, 293 S.W.3d at 156).

### B. Due Process

We begin by addressing Ms. Scott's claim that SCBE violated the procedural due process rights afforded to her by the Teacher Tenure Act by failing to comply with the processes outlined in the statute. Essentially, Ms. Scott argues that the letter sent to her

from Superintendent Hopson to inform her of the charges did not include language which specifically stated that SCBE had formally voted to approve the charges resulting in her termination. She argues that failure to enter this proof constituted failure to prove that Ms. Scott had been afforded the notice required by the Teacher Tenure Act. She also claims that termination without proper notice constituted a violation of the Teacher Tenure Act and presumably that this required the charges to be dismissed. Ms. Scott also claims that the violation entitles her to attorney's fees pursuant to 42 U.S.C. §§ 1983, 1988.

The appellants claim that, because the trial court did not address the issue, Ms. Scott is unable to raise the issue here. The appellants also claim that Ms. Scott failed to raise the issue during the administrative hearing and that, when confronted with the issue at the trial court, they provided sufficient evidence to show that no violation occurred. Ms. Scott responds by asserting that she did raise the argument at the administrative level "during closing arguments." As closing arguments were waived, Ms. Scott appears to contend that raising the issue in her post-hearing proposed findings of fact and conclusions of law constituted raising the argument during closing arguments. Moreover, Ms. Scott appears to argue that it was not her duty to raise the issue as she merely "pointed out that SCBE failed to meet [its] burden of proof when SCBE failed to put on any evidence that the charges against Ms. Scott were approved by the Board." Ms. Scott further asserts that, after SCBE became aware of the issue, they should have requested permission to put on additional proof at the administrative level. She maintains that, because of their failure to do so, any attempt to put on additional proof at the trial court was "in contravention of Tennessee law."[6]

The Hearing Officer did address the matter in her post-hearing findings of fact and conclusions of law. She stated that, while it was true that the superintendent's letter did not specifically state the charges had been approved by SCBE and no board minutes were entered into the record, some evidence did come in on the subject. The Hearing Officer relied on the testimony of Ms. Barnes, who testified that she prepared and hand-delivered a letter to Ms. Scott which was dated March 29, 2018, and which informed her that charges were being submitted to SCBE. The Hearing Officer determined that the testimony "suggest[ed] that the recommendation went before the Board" as the superintendent is required to send a notice to the teacher only "if the Board determines that the charges warrant dismissal." Thus, as Superintendent Hopson sent Ms. Scott notice, that itself "suggest[ed] that the recommendation went before the board." Notably, the issue was not referenced during the post-hearing review conducted by SCBE.

---

[6] The referenced evidence was included in the appellate record. Tennessee Code Annotated section 49-5-513(g) permits additional evidence to be admitted during the chancery court review "to establish . . . violation of statutory or constitutional rights by the board." Tenn. Code Ann. § 49-5-513(g). However, the trial court did not rule on whether to admit the evidence and it was not referenced in the final order. Accordingly, pursuant to our required standard of review as explained *supra*, we will not consider that evidence for purposes of this opinion.

Initially, the trial court pretermitted the issue entirely, stating that, "[b]ecause this Court finds that SCBE unlawfully dismissed Ms. Scott without cause, in violation of Tennessee Code Annotated section 49-5-511, it will not be necessary to address the merits of Ms. Scott's due process claim." We later remanded the case in part for the trial court to rule on Ms. Scott's assertion that the violation of her due process rights meant that she was entitled to an award of attorney's fees. In its post-remand order, the trial court stated that it had pretermitted the issue after finding Ms. Scott had been unlawfully dismissed and then stated that, "[c]onsistent with [the original order] and after review of the entire record in this cause, the Court DENIES Petitioner's request for attorney fees."

Our Supreme Court has previously discussed the procedures a schoolboard is required to follow when assessing a tenured teacher with one of the charges outlined in the Teacher Tenure Act. In *Thompson*, a tenured teacher was terminated after she did not return timely from a period of sick leave. *Thompson v. Memphis City Sch. Bd. of Educ.*, 395 S.W.3d 616, 618-19 (Tenn. 2012). When this happened, a single administrator decided to dismiss the teacher "and a cascade of noncompliance with the Tenure Act resulted." *Id.* at 624-25. The Supreme Court determined that no written charges had been presented to the board and accordingly, the board had failed to make the required preliminary determination of whether the charges would have warranted the teacher's dismissal. *Id.* at 625. The *Thompson* Court stated that the procedures outlined in the Teacher Tenure Act were required to be followed prior to a tenured teacher being dismissed. *Id.* at 623. These included written charges being "presented to the board of education specifically stating an offense that would amount to cause for the teacher's dismissal" and that only after the board of education had determined that the charges warranted dismissal would the teacher be provided with written notice of decision, a copy of the charges levied against the teacher, and a form advising the teacher of his or her legal duties, rights, and recourse pursuant to the statute. *Id.* at 623-24. *See* Tenn. Code Ann. §§ 49-5-511(a)(2)(4)-(5). Accordingly, the Court held that, "[t]he undisputed material facts clearly establish[ed] that Ms. Thompson was a tenured teacher and that the Board violated her rights under the Tenure Act." *Id.* at 627. Recently, the Court relied heavily on *Thompson* to support the premise that the procedural framework outlined in the Teacher Tenure Act is mandatory for both administration and teachers. *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 19-20 (Tenn. 2021) (finding that a tenured teacher did not follow the procedural framework outlined in the Teacher Tenure Act when she brought a constructive discharge claim against the school board and its administrators, rather than exhausting her administrative remedies).

Ms. Scott relies heavily on *Thompson* to support her claim that SCBE violated her due process rights by failing to follow the procedural steps outlined by the Teacher Tenure Act. *See* Tenn. Code Ann. section 49-5-511(a)(2)(4)-(5). However, the facts in *Thompson* differ significantly from those here. In *Thompson*, the teacher received a letter signed by a single labor relations administrator which stated that the administrator had determined that discipline was warranted and informed the teacher that she was being terminated. *Thompson*, 395 S.W.3d at 619. The letter failed to identify any specific grounds supporting

the termination and did not inform the teacher of her legal duties, rights, and recourse pursuant to the Teacher Tenure Act. *Id.* Conversely, Ms. Barnes delivered a letter to Ms. Scott dated months in advance of her termination letter, which informed her that charges were going to be brought before SCBE. Ms. Scott later received a second letter from Superintendent Hopson informing her of her termination, outlining the charges levied, listing the specific actions supporting those charges, and informing her of her rights as a tenured teacher to appeal the termination.[7]

The teacher in *Thompson* was also not afforded an administrative review of her termination, but rather, was required to file an action directly in the chancery court to raise her issues. *Id.* Conversely, Ms. Scott was informed of her right to an administrative hearing in the letter sent by Superintendent Hopson and was able to participate in such a hearing. During that hearing, she called and cross-examined witnesses, testified on her own behalf, and was able to submit evidence. After the hearing, she received another level of administrative review as she appealed the ruling directly to SCBE. After exhausting her administrative reviews, she was then permitted to a judicial review of the cause, which occurred in the trial court.

Prior to determining whether the differences between this matter and *Thompson* and the evidence submitted lead to a different result, we must first determine whether Ms. Scott properly preserved the issue. Of particular concern was her failure to challenge the procedure followed by SCBE until her post-hearing proposed findings of fact and conclusions of law.

We have previously considered arguments that a tenured teacher waived an argument pertaining to whether the board complied with the procedural due process requirements of the Teacher Tenure Act. In *Finney*, we considered whether a tenured teacher waived a due process claim in which she alleged that the schoolboard had not properly identified certain incidents in the charging document and thus those incidents could not serve as the basis for her dismissal. *Finney v. Franklin Special Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 681 (Tenn. Ct. App. 2018). The school board argued that because the teacher had not objected to evidence related to the incidents during the administrative hearing, that the issue was waived. *Id.* We found that the issue was not waived although there was no objection to the evidence at the hearing because the statute allowed all evidence deemed relevant by the submitting party to be entered into the record. *Id.* at 682 (*See* Tenn. Code Ann. § 49-5-512(a)(4)). Importantly, we also noted that the teacher had raised the issue in both "her pre-hearing memorandum and in her post-hearing memorandum, which the Hearing Officer requested prior to rendering his decision." *Id.*

---

[7] The teacher in *Thompson* did eventually receive a letter from the superintendent informing her of her termination, but only after she had already filed a complaint in the chancery court and over two years had passed since she received the original termination letter. *Thompson*, 395 S.W.3d at 619-20.

However, in *Emory*, our Supreme Court held that a challenge to the timeliness of a hearing was "not properly before [it] because [the teacher] failed to raise her timeliness objection either before or during the Board hearing." *Emory*, 514 S.W.3d at 153. The Court reviewed the record and determined that, "[the teacher] received a full and fair hearing" as it was evident that "[s]he was given ample opportunity to put on proof, present testimony from witnesses on her behalf, testify on her own behalf, cross-examine the Board's witnesses, answer questions from Board members, and argue her view of significant events that were the basis for the charges." *Id.* at 151. Further, the Court found that had Ms. Emory raised the issue at the hearing, then the Board could have addressed the issue at that time and granted the same relief sought during the appellate proceedings. *Id.* at 152. The Court stated that, "[t]he efficient and fair administration of justice demands that a litigant not be permitted to withhold her objections, await the outcome, and then complain that she was denied her rights if she does not approve of the resulting decision." *Id.* (citations omitted).

Our Supreme Court has also considered a similar issue in the context of a non-tenured teaching assistant. *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216 (Tenn. 2010). There, the assistant claimed that the schoolboard violated his procedural due process rights based on the administrative procedures followed in effecting his termination, particularly as it related to a full, pre-termination hearing on the matter. *Id.* at 224-25. As a non-tenured teaching assistant, the appellant was permitted to respond in writing rather than participating in a full administrative pre-termination hearing. *Id.* at 221-22. However, he was later permitted to participate in a hearing before the schoolboard after his termination, at which he was represented by counsel, but did not attend. *Id.* at 223-24. Counsel did not argue that a full hearing should have taken place prior to his client's dismissal, or that the hearing should have been continued due to this client's absence. *Id.* at 224. The Court noted that the teaching assistant could have raised the procedural issue before or during the post-termination hearing and the hearing officer could have considered the issue and ruled on it. *Id.* at 237. The Court also noted that the teaching assistant "failed to prosecute his appeal to the [board of education] to a conclusion on the merits, thereby depriving the [board of education] of the [opportunity to consider and correct the issue]." *Id.* at 237-38. As the teaching assistant did not explain why he failed to raise the issue with either the hearing authority or the board of education, the Supreme Court found that he did not preserve his claim and thus that he had waived his due process issue. *Id.* at 238.

In coming to this decision in *Bailey*, the Court relied heavily on its case *McClellan v. Board of Regents of State University*, in which it stated that a party to an administrative proceeding was required "to raise issues of procedural irregularity" in the same way as "a party in a judicial proceeding" in order to provide the administrative body with "the opportunity to correct procedural errors." 921 S.W.2d 684, 690 (Tenn. 1996). The Court further stated that "[a]llowing parties to acquiesce in the procedures, but to challenge those same procedures on appeal is inefficient and unreasonable." *Id.* The Court explained that "[o]ne appearing before an administrative tribunal must make timely objections to

procedural errors and must raise the errors at the administrative level in order to preserve them for consideration in a petition for judicial review." *Id.* (*citing In re Billing and Collection Tariffs of South Cent. Bell*, 779 S.W.2d 375, 380 (Tenn. Ct. App. 1989). The *Bailey* court applied the same logic and determined that, because the teaching assistant had the opportunity to raise the issue at the administrative level but failed to do so until he filed a case in circuit court, the issue was waived. *Bailey*, 303 S.W.3d at 237-38.

Ms. Scott's claim differs from each of these cases as the issue was referenced only in a post-hearing memorandum. It was not raised in either a pre-hearing document or during the hearing itself. In *Finney*, the subject teacher raised the issue in both pre-hearing and post-hearing memoranda. *Finney*, 576 S.W.3d at 682. The teacher in the *Emory* case did not raise the issue at all until the proceedings in the chancery court. *Emory*, 514 S.W.3d at 145-46. Similarly, in *Bailey*, the teaching assistant did not raise the issue at all at the administrative level or during an appeal to the board of education. *Bailey*, 303 S.W.3d at 237-38. In *Bailey*, the employee was an untenured teaching assistant and thus the case was decided based upon teaching assistant's constitutional due process rights rather than rights afforded by the Teacher Tenure Act. *Id.* at 230. We find that this set of circumstances squares more with those of *Emory* and *Bailey* than those of *Finney*.

Ms. Scott failed to address the issue either before or during the hearing. This prevented the Hearing Officer from hearing arguments and receiving evidence which would have allowed her to make a ruling on the merits of the issue. It is not clear why Ms. Scott waited to present the issue in her post-hearing memorandum after the close of proof. We find that her actions in doing so were fatal to her claim.

The procedural due process afforded by the Teacher Tenure Act is intended to ensure that schoolboards place the teacher on notice of the charges being brought against them and to enable the teacher to prepare a defense to those charges. *Thompson*, 395 S.W.3d at 624-25 (*citing Potts v. Gibson*, 469 S.W.2d 130, 133 (Tenn. 1971) (stating that "the first essential" when dismissing a tenured teacher is to provide "a notice sufficient in substance and form to fairly apprise the teacher of the charge against him and enable him to prepare his defense in advance of the hearing")). Here, Ms. Scott was provided with a letter which alerted her of the intention for charges to be brought before the board, and then another letter which listed charges, outlined the behavior supporting those charges, and informed her of her rights as a tenured teacher. She was also able to participate in a full hearing in which she challenged the charges brought against her, called multiple witnesses, testified on her own behalf, cross-examined SCBE's witnesses, and submitted her own exhibits. Had Ms. Scott brought the issue forth either before or during the hearing, the hearing officer could have assessed the veracity of the claim and ordered any necessary relief. Ms. Scott also could have sought to have the issue resolved during the review performed by SCBE, but she did not raise the issue.

In *Emory*, our Supreme Court stated that, "[a]llowing a party to hide an ace up her

- 19 -

sleeve for appeal would undermine fair play and finality of judgment" and that "our reaffirmed insistence upon contemporaneous objections to agency errors should provide incentive for litigants to see that all procedural deficiencies are addressed before the administrative body completes its consideration of a dispute." 514 S.W.3d at 152. If we allowed Ms. Scott to raise this allegation in her post-hearing memorandum, we would be encouraging litigants to sit on their concerns regarding procedural irregularities during an administrative hearing rather than encouraging them to raise issues promptly, allowing a hearing officer the opportunity to consider the issue after hearing arguments from both sides and receiving evidence on the issue.

We find that Ms. Scott's failure to raise the issue prior to her post-hearing memorandum constituted waiver of the issue. Ms. Scott also failed to prosecute the issue in her appeal before SCBE. For the same reasons, the issue of whether Ms. Scott was entitled to an award of attorney's fees was also waived. Further, the issue of attorney's fees was not raised in the post-hearing memorandum, but only in the chancery court. As such, that issue was waived regardless. Therefore, we affirm the trial court's denial of Ms. Scott's due process claim.

### C. Whether the trial court erred when it found that Ms. Scott had been terminated without legal cause and ordered that she be reinstated.

Next, we consider whether the trial court erred when it determined that Ms. Scott was "unlawfully terminated in violation of Tennessee Code Annotated section 49-5-511." Pursuant to Tennessee Code Annotated section 49-5-511(a)(2), "[a] teacher may only be dismissed or suspended on the basis of incompetence, inefficiency, neglect of duty, unprofessional conduct, or insubordination." *Elmi v. Cheatham Cnty. Bd. of Educ.*, 546 S.W.3d 630, 644 (Tenn. Ct. App. 2017); *see also Brown v. Shelby Cnty. Sch.*, No. W2022-00123-COA-R3-CV, 2023 WL 4146274, at *8 (Tenn. Ct. App. June 23, 2023). The appellants assert that Ms. Scott engaged in behavior supporting the following three charges: neglect of duty, insubordination, and conduct unbecoming to a member of the teaching profession.[8] The appellants argue that any one of these charges would support Ms. Scott's termination and that the trial court erred when it found Ms. Scott had been "unlawfully terminated."

Tennessee Code Annotated section 49-5-511 states that "[t]he causes for which a teacher may be dismissed or suspended are: incompetence, inefficiency, neglect of duty, unprofessional conduct, and insubordination, as defined in § 49-5-501." Tenn. Code Ann.

---

[8] Tennessee Code Annotated section 49-5-511(2) states that unprofessional conduct is defined in Tennessee Code Annotated section 49-5-501. Tennessee Code Annotated section 49-5-501 does not contain a subsection titled "unprofessional conduct", but we have previously stated that, "Tennessee Code Annotated section 49-5-501 uses the terms 'unprofessional conduct' and 'conduct unbecoming a member of the teaching profession' interchangeably." *Finney v. Franklin Special Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 685 n.6 (Tenn. Ct. App. 2018).

§ 49-5-511 (West). The letter to Ms. Scott which informed her of the charges against her stated that SCBE's decision to terminate her was "[b]ased on the foregoing Charges, individually and/or collectively." Therefore, we agree with SCBE's assertion that any of these three charges could be used as a basis for her dismissal.

### 1. Neglect of Duty

Neglect of duty is defined as the "gross or repeated failure to perform duties and responsibilities that reasonably can be expected of one in such capacity or continued unexcused or unnecessary absence from duty." Tenn. Code Ann. § 49-5-501(8). The trial court determined that Ms. Scott did not neglect her duty stating that, "[t]his was a case of bad management on the part of SCBE. It is undisputed that Ms. Scott asked for help. SCBE did not give her the help or support that they should have provided."

The trial court did not specify what actions of SCBE constituted bad management other than the purported failure to provide Ms. Scott with the assistance she needed. However, the trial court did provide a description of the duties of a school counselor. The trial court stated that, "[u]nder Tennessee law, professional counselors are required to 'provide preventative and developmental counseling to school students in order to prepare them for their school responsibilities and their social and physical development.'" *Quoting* Tenn. Code Ann. § 49-6-303(b). The trial court also stated that, at the time, the Tennessee Board of Education Teacher Regulations provided that, among other things, the duties of a counselor included:

> (l) consulting with students about decisions and goals, (2) providing counseling in educational planning and placement, (3) provid[ing] academic development of students through the interpretation and use of assessments, (4) providing up-to-date, accurate student records as relates to the guidance program, (5) aid[ing] school staff in the early identification of student problems, and (6) aid[ing] parents in developing strategies for supporting their children's educational programs.

Tenn. Comp. R. & Regs. 0520-02-02-.26 (repealed Nov. 2018). In her brief, Ms. Scott acknowledged that these regulations applied to her at the time of her employment.

The appellants argue that the trial court erred when it found that Ms. Scott did not neglect her duty. They allege four duties which Ms. Scott failed to perform. First, Ms. Scott failed to complete a transcript audit of the senior class in a timely manner. Second, Ms. Scott failed to conduct one-on-one meetings with members of the senior class in a timely manner. Third, Ms. Scott failed to provide weekly updates categorizing the senior class into those on pace to graduate on time, those who could graduate if certain conditions were met, and those who were not going to graduate. Finally, Ms. Scott failed to timely and properly schedule students for their classes at the beginning of the 2017-2018 school

year. The appellants cite the failures of Ms. Scott as the "counselor error" which prevented approximately 14 seniors from graduating on time.

The appellants further claim that the evidence preponderates against the trial court's finding that Ms. Scott's actions were due to "bad management." To support this, the appellants point to the following facts: (1) Ms. Scott never requested assistance from SHS administration to complete the student schedules prior to the beginning of the 2017-2018 school year, (2) neither Ms. Scott nor any other counselors objected to the August 4, 2017, deadline set for the schedules during the July 31, 2017, meeting, and (3) Ms. Scott was granted an extended deadline to complete the schedules.

Conversely, Ms. Scott claims that she did not neglect her duties. She does not appear to deny SCBE's contention that she failed to perform the duties or responsibilities reasonably expected of her as a guidance counselor, but rather that the following circumstances prevented her from performing those duties: (1) SHS failed to timely replace her while she was on FMLA leave; (2) SHS did not grant Ms. Good PowerSchool access when she was hired as the substitute counselor; (3) SHS became aware of errors and issues with student records and schedules while Ms. Scott was on leave and failed to address them; (4) SHS did not provide her with the tools, specifically PowerSchool, necessary to perform her job, and (5) SHS did not provide her with assistance when she requested it. Ms. Scott claims that SHS administration's actions caused the issues and that "[a]dministrators were willing to let students fail and suffer to prove some type of point against [her]."

Ms. Scott does not appear to argue that she did not fail to complete the tasks outlined by the appellants, but rather, that the issues cited by the appellants were caused by the failures of SHS administration and thus, "any neglect [of duty] in this matter lies more with SCBE." Accordingly, we will consider whether the evidence contained in the record preponderates against the trial court's finding that Ms. Scott was unable to perform her job functions because of "bad management."

First, we consider Ms. Scott's contention that she was unable to perform her duties because SHS did not hire a substitute counselor until February 2017. There is disagreement as to the gravity of SHS waiting to hire a substitute until February 2017 largely due to a dispute regarding the amount of time that Ms. Scott was out on extended FMLA leave. Ms. Scott claims that she was out on extended leave during both the 2015-2016 and 2016-2017 school years. Conversely, the appellants claim that Ms. Scott was only on extended leave during the 2016-2017 school year. Obviously, if Ms. Scott took extended leave during two school years, then SHS waiting until February 2017 to hire a substitute could have had a detrimental effect on student management. However, if she was only absent for two periods of leave during the 2016-2017 school year, then hiring a substitute shortly after the second period of leave began would have been reasonable.

The topic was addressed at oral argument. Counsel for SCBE stated that Ms. Scott took only two periods of leave, one in the fall of 2016 and the other in the spring of 2017. Counsel explained that the confusion came from some testimony provided by Mr. Hardiman in which he stated Ms. Scott took extended leave during both the 2015-2016 and 2016-2017 school years. Counsel indicated that Mr. Hardiman had simply been mistaken when he said this. However, counsel for Ms. Scott, during oral argument, reaffirmed the contention that she was out for two years rather than one. Our review of the record shows that Ms. Scott only testified to taking two periods of FMLA leave and both of those occurred during the 2016-2017 school year. She was later asked specifically whether she was "there for most of the [2015-2016] school year" to which she answered "[c]orrect." The trial court made no mention of leave during the 2015-2016 school year in its order. Having reviewed the record, we find the evidence preponderates in favor of a finding that Ms. Scott only took extended leave during the 2016-2017 school year. Therefore, SHS's decision to hire a substitute counselor on February 22, 2017, was reasonable as Ms. Scott's second period of leave began on January 11, 2017. Further, Ms. Scott has not demonstrated that SHS's decision to hire a substitute counselor in February 2017 had any adverse effect on her ability to perform her duties.

Next, we consider the fact that Ms. Good was not granted access to the PowerSchool system and thus could not upload student schedules at the end of the 2016-2017 school year. The evidence indicated that no counselors were able to upload student schedules at that time as there were issues with the school's master schedule. Further, Mr. Hardiman called a meeting on July 31, 2017, in which he instructed all the SHS counselors to have schedules completed and uploaded by August 4. This indicates that there were possibly other counselors who had not uploaded schedules at that time. Additionally, despite being unable to upload student schedules into PowerSchool, Ms. Good had created binders which contained a transcript, the results of two transcript audits, and a four-year plan. Ms. Good stated that those binders should have allowed a professional counselor to generate a student's schedule. Ms. Scott had access to the binders, which were intended to make generating the schedules easier. Thus, Ms. Good's inability to access PowerSchool did not affect Ms. Scott's ability to perform her duties as she had a similar amount of time as the other counselors to complete student schedules. Further, Ms. Good had performed a good deal of the preliminary work while serving as the substitute.

This same line of reasoning applies to the third circumstance cited by Ms. Scott. She claims that SHS became aware of issues with student transcripts and schedules while she was on leave and did not address them. She does not assert what specific issues caused her to be unable to perform her duties, but we presume she meant students missing credits. However, the binders were created by Ms. Good with the errors she found in mind. For example, Ms. Good testified regarding the contents of the binder as pertained to a student whose initials were R.M. First, Ms. Good reviewed the list of students who were unable to graduate on time due to counselor error. R.M.'s name was on this list, and the class listed as missing was World History. In the binder, written in ink on one of this student's

documents was information indicating that he needed to take World History. Ms. Good indicated that someone reviewing the binder would have been made aware by this notation that R.M. needed to take World History to meet his graduation requirements. We agree. The binders were created to aid in student scheduling and should have provided Ms. Scott with the information necessary to create a plan to address these issues in a timely fashion.

Next, Ms. Scott claims that she did not have access to PowerSchool and thus was unable to perform her duties. We understand her argument to mean that she was without PowerSchool access until she completed her training, that this caused her to fall behind on scheduling students, and thus she should be excused for failing to perform her duties. We disagree. Requiring Ms. Scott to complete a training program for two days does not constitute a failure to equip her with the tools necessary to do her job. In fact, it is quite the opposite as the purpose of the training was to make Ms. Scott competent in using PowerSchool so she could perform her duties. Further, nothing in the record suggests that the training itself was inadequate. Ms. Scott only stated that she was required to pay attention to the modules to progress and that it was not the "hands-on" training she was accustomed to.

Finally, Ms. Scott claims that she was not granted assistance when she requested it. Conversely, SCBE claims that Ms. Scott did not timely ask for assistance. There is no record of Ms. Scott asking Mr. Hardiman for assistance regarding the student schedules prior to August 5, 2017, which was one day after the deadline. The only records relating to a request for help were the text messages sent by Ms. Scott to Mr. Hardiman. The record indicates that Mr. Hardiman did provide some amount of assistance after receiving these texts as he printed the schedules the following Monday. Ms. Scott was also able to meet with Dr. Taylor for professional development during the school year. Presumably, Ms. Scott also refers to Mr. Hardiman instructing Ms. Good to cease helping her conduct the one-on-one student meetings. However, this is irrelevant, as Ms. Scott had not begun conducting those meetings until after the due date had passed. Therefore, it does not appear that SHS refused to provide assistance to a degree which would have prevented Ms. Scott from performing her duties.

Having carefully reviewed the entire record, we find the evidence preponderates against the trial court's finding that Ms. Scott was prevented from performing her duties as a guidance counselor by "bad management." The trial court cited only the failure of SCBE to render Ms. Scott assistance as "bad management," but the record indicates that Ms. Scott did not seek assistance in a timely fashion. The record does not indicate that she contacted SHS administration with legitimate concerns about the student scheduling prior to the August 5 deadline. The record also does not support a finding consistent with Ms. Scott's additional examples of bad management because she was not placed in a situation worse than that of the other counselors at SHS and was provided with the resources and tools necessary to perform her job functions.

Further, the evidence preponderates against the trial court's finding that "Ms. Scott did not commit the offense of neglect of duty." Previously, we have considered the charge of neglect of duty in the context of a teacher being tardy to school. *See Beck v. Dyer Cnty. Bd. of Educ.,* No. W2021-01136-COA-R3-CV, 2023 WL 5608076, at *7 (Tenn. Ct. App. Aug. 30, 2023) (finding a teacher engaged in neglect of duty where "he left campus without authorization on 172 days."); *Harper v. Shelby Cnty. Sch.*, No. W2018-01100-COA-R3-CV, 2019 WL 1453092, at *7. (Tenn. Ct. App. Apr. 1, 2019) (finding a teacher did not engage in neglect of duty where the evidence did not support the Board's claim that the teacher was tardy on at least 35 occasions.) Both cases consider a tenured teacher charged with the offense of neglect of duty due to tardiness. This is consistent with the portion of the definition of neglect of duty which identifies "continued unexcused or unnecessary absence from duty" as a form of neglect of duty. Tenn. Code Ann. § 49-5-501(8). However, none of our case law addresses a situation akin to the present situation, in which the neglect of duty relates to the first portion of the definition, which identifies as neglect of duty the "gross or repeated failure to perform duties and responsibilities that reasonably can be expected of one in such capacity." *Id.*

However, several of our sister states have previously considered similar circumstances. *See Ragland v. Nash-Rocky Mount Bd. of Educ.*, 787 S.E.2d 422, 432-33 (N.C. Ct. App. 2016) (upholding a board's decision to terminate a teacher for neglect of duty and other charges where a teacher failed to maintain order in his classroom when a student became violent by "stripp[ing] to his bare torso, and 'prepar[ing] for combat'" rather than mitigating the circumstances and seeking assistance.); *Chattooga Cnty. Bd. of Educ. v. Searels*, 691 S.E.2d 629, 631-32 (Ga. Ct. App. 2010) (finding a board's decision to terminate a teacher for insubordination and neglect of duty which she committed "'by repeated violations of the dress code, by making inappropriate oral comments about a student with disabilities in the student's presence, and by removing from school and taking to her home prescription medication of a student'" was supported by the evidence.); *Pratt v. Alabama State Tenure Comm'n*, 394 So.2d 18, 21 (Ala. Civ. App. 1980) (stating that neglect of duty "describes a failure to do what one is required by law or contract to do" and accordingly that a teacher engaged in neglect of duty where he was required to administer an "Individual Education Program" but failed to do so.); *Knox Cnty. Bd. of Ed. v. Willis*, 405 S.W.2d 952, 955 (Ky. 1966) (finding the record contained "evidence of a neglect upon [the teacher] in controlling her classes and students" and thus the board's termination of the teacher was rightful based in part on neglect of duty where the teacher "fail[ed] to maintain any sort of discipline.")

Here, we find that the evidence preponderates in favor of a finding that Ms. Scott grossly failed to perform the duties and responsibilities expected of her as a professional guidance counselor. Most condemning is Ms. Scott's failure to "aid school staff in the early identification of student problems" as required by the Tennessee State Board of Education Teacher Regulations. Tenn. Comp. R. & Regs. 0520-02-02-.26 (repealed Nov. 2018). Clearly, Ms. Scott neglected this crucial aspect of her role as guidance counselor

when she failed to even begin conducting the one-on-one student conferences mandated by SHS administration before the due date. Ms. Scott acknowledged that conducting these conferences is what led her to realize that issues existed with many of the senior students and what spurred her to begin placing students in various credit recovery courses and to begin placing students in classes. Clearly, this constitutes a failure of Ms. Scott to identify major student problems as required by her job description. This failure was also exacerbated by Ms. Scott failing to notice scheduling issues when she purportedly conducted a transcript audit in October 2017. The issues with senior schedules should have been discovered and addressed much earlier. Failure to do so constitutes neglect of duty. This is magnified by the fact that her failure to identify and address those problems led to approximately 14 members of the senior class being unable to graduate on time solely due to "counselor error."

Based upon the evidence in the record, the ruling of the trial court is reversed, and we find that Ms. Scott was guilty of neglect of duty as defined in Tennessee. Code Annotated section 49-5-501(8). As previously stated, the letter to Ms. Scott which informed her of the charges against her indicated that the "Charges, individually and/or collectively" would serve as the basis of her termination. We find that Ms. Scott was guilty of the charge of "neglect of duty," that it was a sufficient charge to warrant dismissal pursuant to the statute and under the letter of dismissal which she received. Therefore, it is not necessary for us to tax the length of this opinion by addressing the other charges against Ms. Scott. Those issues are pretermitted.

**B. Whether the trial court erred when it awarded Ms. Scott backpay in the amount of $400,596.40 despite the lack of evidence in the record as to Ms. Scott's salary at the time of her termination.**

The trial court awarded Ms. Scott backpay in the amount of $400,596.40. Having determined that Ms. Scott was validly terminated from her employment, she is not entitled to an award of backpay. Accordingly, the trial court's award is reversed.

## IV. Conclusion

For these reasons, the judgment of the trial court is affirmed in part and reversed in part. Costs of this appeal are taxed to the appellee, Lagina Scott, for which execution may issue if necessary.

_____

CARMA DENNIS MCGEE, JUDGE